

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NOS. PD-0041-17 & PD-0503-17

### REX ALLEN NISBETT & GEORGE DELACRUZ, Appellants

### v.

### THE STATE OF TEXAS

### PETITIONS FOR DISCRETIONARY REVIEW
### FROM THE THIRD COURT OF APPEALS
### WILLIAMSON AND TRAVIS COUNTIES

**KELLER, P.J., delivered the unanimous opinion of the Court.**

Appellants Rex Allen Nisbett and George Delacruz were convicted of murder in unrelated trials. Although the cases are factually unrelated, there are many factual similarities between the two, including that, in each case, the victim's body and the murder weapon were never recovered. In Nisbett's case, the court of appeals held the evidence to be insufficient to support the conviction and rendered a judgment of acquittal. In Delacruz's case, a different (but overlapping) panel of that

court affirmed the conviction.[1]  We granted review and consolidated these cases to address the appropriate analysis when the victim's body and the murder weapon are not found.  We ultimately hold that the evidence was legally sufficient to support both convictions.  Consequently, we reverse the court of appeals's judgment in Nisbett's case and affirm the judgment in Delacruz's case.

## I. BACKGROUND

### A. Nisbett

Nisbett and his wife Vicki had a troubled relationship and were getting a divorce.  Vicki had moved to an apartment with their three children, but she allowed Nisbett to live with them during the days leading up to Christmas of 1991.  On December 14, Vicki had plans to attend a company Christmas party with a co-worker.  Vicki and Nisbett argued about Vicki going to the party, and at some point during the altercation Nisbett choked her.  Vicki did not meet the co-worker as she had planned to do, and she never showed up at the party.  In fact, after December 14, 1991, Vicki was never seen or heard from again.  Nisbett had previously made statements suggesting a wish to murder his wife, he engaged in suspicious activity and made suspicious statements to law enforcement and others on or after the date of Vicki's disappearance, he wrote a check on Vicki's bank account after her disappearance, there was circumstantial evidence linking him to Vicki's car after her disappearance, and there was physical evidence indicating that Vicki had been killed.  Her body, however, was never recovered, and law enforcement never located a possible murder weapon.

We set forth the facts developed at trial in further detail below.

### 1. *Nisbett and Vicki's Troubled Relationship*

Nisbett and Vicki were high school sweethearts.  They married shortly after high school and

---

[1]  One justice was on both panels.

they had three sons together. Around ten years later, on November 15, 1991, Vicki filed for divorce and moved with the children to a new apartment. Nisbett opposed the divorce. He wanted to stay near the boys during the holidays, so Vicki allowed him to stay with them, with the understanding that it was a temporary situation and that she was still moving forward with the divorce.

Jerry Fryer, the Nisbetts' pastor, testified that he had developed a relationship with Nisbett and Vicki through the Trinity Christian Center and that part of his ministry included helping couples who were experiencing difficulty in their relationships. Fryer had been counseling Vicki and Nisbett together, and he also counseled Vicki individually. During his last meeting with Vicki, two or three days before she disappeared, she was crying and appeared to be "extremely fearful." She declined Fryer's offer to help arrange a different place for her to stay during this troubled period.

### 2. *Nisbett's Statements Suggesting Desire to Murder Vicki*

Nisbett once told Vicki's brother that he would kill Vicki before he let her divorce him and take his three boys. Nisbett told a co-worker that he had caught his wife cheating on him and thought about killing her, but "that wouldn't be the Christian thing to do." Nisbett had also previously gone to his brother Mike's property with Vicki's brother Mark. Nisbett showed Mark excavation holes that had been dug and said, "You could throw a body in there and no one would ever find it."

### 3. *Suspicious Circumstances on the Day Vicki Disappeared*

On Saturday, December 14, 1991, Vicki had plans to attend her company Christmas party with co-worker Julie Coen Tower. Tower spoke with Vicki several times throughout the day to confirm their plans. When Tower first called Vicki at around 2:30 p.m., she overheard Nisbett and Vicki arguing. Vicki was agitated and upset, and she explained that she wanted to keep her plans

with Tower but that she was arguing with Nisbett because he did not want her to go to the party. When Tower called a few hours later, at 5:00 p.m., the arguing had not abated. Vicki told her that Nisbett had choked her and left bruise marks on her neck and throat. Vicki sounded "pretty hysterical" during that phone conversation, and Tower told Vicki to get her stuff and come to Tower's apartment immediately and they could get ready for the party there. When Vicki failed to show up after thirty or forty-five minutes, Tower called her again. Nisbett answered the phone and said that Vicki had just left and was headed to the party or to Tower's place. Thirty minutes later, around 6:00 or 6:30 p.m., after Vicki still had not arrived, Tower called again. This time, Nisbett told Tower that Vicki had told him that Tower had "slowed her down a little bit and she just went ahead and went straight to the party."[2] Vicki was not seen at the Christmas party.

Wayne Castleberry also spoke with Vicki on that Saturday. Wayne had met Vicki at a local nightclub, and they had exchanged numbers. They later met for lunch and talked during the week on the phone. Vicki had explained to Wayne that she was going through a divorce but would like to see more of him after Nisbett moved out. When Wayne called Vicki's apartment the afternoon of December 14, Nisbett picked up another phone extension to eavesdrop. In a harsh tone, Nisbett accused Vicki of talking about him and told her to hang up the phone. Vicki's demeanor changed and she responded suddenly with, "I have to get off the phone," and hung up. Wayne and Vicki had planned to meet after the Christmas party, but he never heard from her again.

Morris "Bubba" Smith lived in the same apartment complex as Vicki with his sister, Lana Faye Reed. Bubba recalled that Nisbett came over late one afternoon in December and asked to

---

[2] Tower testified that, because they did not have cell phones at this time, Nisbett would have had no way of knowing that Vicki had decided to go straight to the party instead of Tower's place.

borrow his car, a 1969 Nova. Nisbett also asked Bubba to watch his three boys. Nisbett returned the car to Bubba the next morning, but it was damaged—there was damage to the chrome rims around the headlights and "the trunk lock was knocked out."[3] Bubba could not recall the exact time or date that Nisbett borrowed his car, but his sister Lana remembered because she rented movies for the children when they were asked to babysit. Lana corroborated these details by providing investigators with a receipt for the movie rentals dated December 14, 1991. Bubba had never babysat for the boys before.

Between 9:30 and 9:35 p.m. on December 14, a police officer saw a car traveling northbound on South Bell Road (also known as highway 183) in Cedar Park. The car was traveling slowly in the left lane, so the officer ran the license plate number. The license plate was from Vicki's car. The officer was going initiate a traffic stop, but he received a more serious call from dispatch to which he needed to immediately respond. The location where the car was seen was between where Vicki lived when she disappeared and where she and appellant used to live—Liberty Hill—before Vicki filed for divorce.

### 4. *No Sign of Vicki after the Day She Disappeared*

On Monday, December 16, Vicki did not show up for work. Her unexplained absence concerned her supervisor, Sheila Vanderwood, because it was out of character for Vicki to miss work without calling in. When Vanderwood called Vicki's apartment, Nisbett picked up the phone and said that he had not seen her since she left for the party. Vanderwood told Nisbett that she intended to report Vicki missing. Shortly after she did so, Nisbett also reported Vicki missing.

---

[3] This particular make of car, a 1969 Nova, required two sets of keys—one key for the ignition, and another key to open the trunk. Nisbett did not have a key to the trunk of the vehicle.

When Officer Proctor arrived at Vicki's apartment to file the missing persons report, two days after she disappeared, her apartment was immaculately clean. This was uncharacteristic of Vicki's apartment, which was usually cluttered and in a state of disarray, with things strung around, in a way that is normal for a home with children. All of Vicki's personal effects were still in her bathroom, which led Officer Proctor to believe that she had not left town.

None of Vicki's family members ever saw or heard from her again, nor did anyone at Vicki's place of employment. After December 14, Vicki did not write any checks or withdraw any money from her bank account. She did not renew her driver's license when it expired. The Department of Public Safety's Missing Persons Clearinghouse pored through various databases looking for any electronic evidence that Vicki was still alive and could find none. No activity involving her social security number could be found. There were no vehicle registrations, no phone bills, and no municipal utility bills connected to her. In addition, Vicki's fingerprints, dental records, and DNA profile were in national databases, and no hits were received on any of these. At the time of trial, the Clearinghouse had been actively searching for Vicki, alive or dead, for over 22 years.[4]

There was also testimony from Vicki's mother, pastor, and a co-worker that Vicki was a good mother who would not abandon her children.

### 5. *Nisbett's Suspicious Behavior and Statements to Law Enforcement*

The morning after the Christmas party, Nisbett called Tower and asked where his wife was.

---

[4] On December 29, 1991, two weeks after Vicki disappeared, Kelly Misfeldt stated that he saw Vicki outside of his apartment complex at around 5:00 p.m., and that he was "99 percent sure that it was her." Misfeldt was looking out from his second-story window, and the woman he observed was approximately thirty-five feet away. There was no artificial lighting in that particular area of the apartment complex. Misfeldt wore glasses, and he was wearing glasses at the time he believed he saw Vicki.

Tower responded, "You tell me. What did you do with her?" Nisbett hung up.

Nisbett did not contact Vicki's mother, Carol Johnson, for several months after Vicki disappeared, and he did not allow her to spend time with her grandsons until seven or eight months later. He then limited her visits and exposure to the boys—not allowing her to spend time alone with them. This was a significant departure from the relationship Carol had enjoyed with her grandsons before Vicki disappeared. Nisbett explained that he needed to monitor the visits because he needed to "protect himself."

Vicki's apartment was designated a crime scene in January of 1992. Chief Richard Elliott told the apartment complex manager, Lori Johnston, that he suspected foul play at Vicki's apartment, and she gave Elliott consent to investigate. Nisbett showed up twice while investigators searched Vicki's apartment. He first arrived at 6:30 p.m. and wanted to know what the investigators were doing. Elliott explained that they were looking for evidence in the master bedroom. Nisbett assured everyone that Vicki was ok—that she had just run away—and suggested that the investigators were wasting their time. Chief Elliott testified that, although it was cold in January, Nisbett was visibly sweating and appeared to be "extremely nervous." Nisbett returned later that evening at around 9:30 p.m. to inquire about what the investigators discovered. Elliott told Nisbett that he would have a preliminary report from the Crime Lab the next day, and he invited Nisbett to come to his office at the station then to go over all the information and his theory about what happened to Vicki. Nisbett did not show up at Elliott's office the next day. Instead, an attorney called Elliott to say that Nisbett would not be showing up, and he asked Elliott to refrain from speaking to Nisbett.

Further into the investigation, Elliot arranged for Vicki's mother to get a message to Nisbett that investigators had found Vicki's body. Elliott's hope was that this news would spook Nisbett

into some sort of action that would lead them to evidence of Vicki's whereabouts, or perhaps the remains of her body. Elliott set up unmarked patrol cars and surveillance around Nisbett's apartment and waited for Vicki's mother to give Nisbett the message. Elliott's team watched Nisbett come outside of his apartment two times and walk around in the parking lot for a few minutes before going back inside. Nisbett was picked up by a female, and she drove him up Highway 183. They went down a road that had several large wooded areas, and they finally arrived at Blockhouse Creek Elementary School. Elliott testified that he later searched some of those areas with cadaver dogs, but the wooded area was enormous, and the search was not fruitful.

After Vicki disappeared, Nisbett gave various stories about where he thought Vicki might be. He initially told investigators that he believed Vicki had run off with another man because she had done so on other occasions. Later into the investigation, however, he stated that he thought Vicki was visiting a girlfriend in Galveston. In the days after Vicki's disappearance, Nisbett told Vicki's mother that he did not know where Vicki was. Nisbett claimed that he had hired a private investigator for $30,000 to locate Vicki, but he never provided the investigator's name or was able to confirm that he had actually hired anyone. In April of 1992, when notorious serial killer Kenneth McDuff made the news in Texas as a possible serial killer, Nisbett approached law enforcement to share his belief that McDuff must have been responsible for Vicki's disappearance. Chief Elliott testified that there were no leads or evidence to support a theory that Kenneth McDuff was linked to Vicki's disappearance.

Nisbett initially denied having any physical altercation with Vicki on the evening of her party but later told investigators that he pushed her away after she initiated a physical altercation. He also told investigators that he stayed at home with the kids the entire night Vicki disappeared, but this

statement was contradicted by his neighbors' testimony that they babysat the kids and watched movies while Nisbett borrowed Bubba's car.

### 6. *The Check Nisbett Forged and Vicki's Car*

Five days after Vicki's disappearance, Nisbett forged Vicki's signature on one of her checks to pay for gasoline. The check number was 698, and Vicki's bank account indicated that this check had been written out of sequence with other checks that Vicki had previously written on the account. Nisbett appeared to be surprised to learn that investigators were monitoring Vicki's checking account, and he admitted that he had signed the check with Vicki's name. This check was the only check that posted to Vicki's account after she disappeared.

When the sheriff's office released the license plate number of Vicki's missing car in an attempt to locate it, Nisbett called to ask why and seemed to be "a little upset and concerned about that." About two months after Vicki disappeared, police found the car in an HEB parking lot. There was testimony that, before the car was recovered, it—or a car that looked like it—had been seen intermittently at the HEB parking lot.

Even though Nisbett's name was listed on the vehicle registration, he refused consent to search the car. When officers finally did search it, they found Vicki's checkbook. Investigators noted an out-of-sequence check missing from the checkbook that was later confirmed to be the same check that Nisbett used to buy gas.[5] Investigators also discovered that the car's interior dome light had been removed, disabling any automatic light function when the doors opened.

### 7. *Vicki's Blood in the Apartment and Appellant's Bloody Handprint*

---

[5] Also, the number 676 can be seen on the front of the checkbook in a photo taken of the contents of the car at the time the car was recovered.

Forensic investigators initiated a search of Vicki's apartment five weeks after she disappeared, when Nisbett was evicted. A serologist observed stains on the carpet and on the sheetrock on the walls. The stains were visible to the naked eye, but it was not possible to determine what the stains were just by looking. The results of a chemical test performed on the stains confirmed that they were human blood.[6]

The serologist also sprayed luminol[7] across the master bedroom and discovered what appeared to be blood stains and drag marks. Investigators pulled up the carpet and discovered a larger concentration of blood that had soaked into the padding. Using the same technique with the luminol spray, investigators discovered what appeared to be a handprint, in blood, on the wall next to a light switch. The investigators excised the part of the sheetrock with the bloody handprint and cut out sections of the bloody carpet and padding, and sent the evidence to other laboratories for DNA and fingerprint testing.

The bloodstains on the wall in Vicki's bedroom and on the carpet and carpet padding in the bedroom closet were determined to be made of Vicki's blood.[8] The bloody handprint on the wall was also determined to be made from Vicki's blood.

---

[6] This test is performed by taking a cotton swab or Q-tip, putting a little bit of water on it, and then swabbing the stain very lightly. A drop of the phenolphthalein solution is then added to the mixture, and it if changes color, it is a presumptive positive test for the presence of blood.

[7] Luminol is a highly sensitive blood reagent used to detect latent bloodstain evidence, usually associated in forensic investigations with a clean up subsequent to a bloodletting event. Investigators will typically spray a solution of luminol and the oxidant, and the iron in blood catalyzes the luminescence. This makes trace elements of blood visible to the naked eye in a bluish-green glow, even if someone has cleaned or attempted to remove it.

[8] Vicki's parents submitted blood samples for DNA analysis, and a comparison of the parents' DNA with these blood stains showed a 99.9999999999 percent probability that the blood came from an offspring of the parents.

Chief Elliott executed a search warrant in 1992 to procure sample evidence of Nisbett's hair, blood, and finger and palm prints. Nisbett told the officers that, regardless of the warrant, he would not voluntarily give them any samples—they would have to obtain the evidence by force. Elliott responded that they would oblige Nisbett, but after he explained the consequences of a physical altercation, Nisbett cooperated and allowed investigators to take the samples. Latent print specialists determined that the bloody handprint on the sheetrock matched Nisbett's prints.

### B. Delacruz

Delacruz and his wife Julie had a troubled relationship and were getting a divorce. Julie had moved out of Delacruz's home, but she went there to pick up their daughter on March 26, 2010. She was never seen or heard from again. Electronic evidence indicates that Delacruz deviated significantly from his usual routine on the day Julie disappeared, that he possessed Julie's cell phone, that he used her credit card, and that he fabricated text messages and social media posts purporting to be from Julie. Delacruz had made statements disparaging his wife, and he engaged in suspicious activity and made suspicious statements to law enforcement and others on and after the date she disappeared. There was also evidence that he dug a hole designed to bury a human body, that Cadaver dogs alerted near this hole, and that something had been burned near the hole. Julie's body, however, was never recovered, and law enforcement never located a possible murder weapon.

We set forth the facts developed at trial in further detail below.

### 1. *Julie Was Known as a Responsible Person and Caring Mother Who Had Many Close Relationships*

Delacruz and Julie married young and had a daughter together, L.D. Julie was widely known as a mature and responsible individual and as a caring and attentive mother who doted on her

daughter. Julie's mother, Sandra Soto, described Julie as a very responsible person and observed that, even though Julie prioritized her education and work, nothing was more important to her than L.D. L.D. had asthma, and she required medication. Julie was always prompt to take L.D. to her doctor visits and to administer L.D.'s medicine when necessary.

Julie worked as a pharmacy technician at Walgreens, and by all professional accounts, she was a model employee. Her supervisor considered Julie to be her best pharmacy technician, and the one upon whom she depended the most. The store manager found that Julie was capable of handling any task and was never late for work. Julie was a very happy-go-lucky person who got along with everyone, and she never had any problems with co-workers or customers.

Julie spent a great deal of time with her sister Samantha—going to movies or dinner during the week, talking on the phone "constantly," and "hanging out" together every other weekend. Michael Soto, Julie's cousin, had a close relationship with Julie and considered her to be more like a sister. Julie was best friends with Natasha Navarro and Amanda Hays, and the three of them "did everything together." Julie was described by members of Delacruz's own family—his mother, sister, and cousin—as "mature," "responsible," "smart," "kind," and valuing education.

### 2. *Julie and Delacruz's Troubled Relationship*

Julie and Delacruz met during their last year of high school, and they moved in together after graduation in 2006. They had a daughter, L.D., and married in May of 2009. They moved in with Delacruz's mother, Victoria Delacruz, where they lived for a time with their young daughter and Delacruz's three younger sisters.

Shortly after they married, Julie began to complain to her friends and family that she was having problems in her marriage. Delacruz was obsessed with playing video games, sometimes

playing for six or seven hours at a time. He spent most of his time playing video games instead of maintaining a job, attending to domestic duties, or caring for L.D. He even played video games at the hospital while Julie was in labor. Julie became concerned with Delacruz's ability to adequately care for their daughter and would often express concerns about leaving L.D. alone with him. According to Julie's aunt, Julie did not like to go home because she and Delacruz would argue about his incessant video gaming. She would also often come home to find L.D. dirty, unfed, and in need of her medication.

Julie and Delacruz separated in November of 2009, and Julie moved into her grandparents' house in Dripping Springs. Julie used her tax refund to buy a new car, a 2006 Chevrolet Impala. Julie was excited about having this new car—something she could call her own—and it appeared to many that it represented her financial achievement and personal independence.

Julie's cousin Michael observed that Julie and Delacruz's relationship became increasingly complicated after the birth of L.D. and that Delacruz became controlling of Julie's time and attention. Michael knew that Delacruz had physically and verbally abused Julie more than once.

Michael and Delacruz "hung out about three or four times" over the course of a month after the separation until his mother and Julie advised him to stop. Delacruz took Michael to the mall to buy clothes, they went to a tattoo parlor together, and they would sometimes "just drive around and smoke." Michael believed that Delacruz was attempting to remain in Julie's life by hanging out with him, because whenever they spent time together, Delacruz pried for information about Julie. Specifically, Delacruz wanted to know what Julie was doing or if she was seeing someone new.

Julie's separation from Delacruz was difficult, and their relationship was rocky. She had filed divorce papers, but Delacruz refused to sign them. Despite their difficulties, Julie always tried

to maintain good communication with Delacruz for L.D.'s sake. Matters were more difficult when Julie had to interact with Delacruz in person while picking up or dropping off L.D., and she typically went with her cousin Michael on those occasions. In February of 2010, Julie asked Michael and one of his friends to accompany her to Delacruz's house to collect some of her possessions. Although the visit was without incident, Michael's friend thought that Delacruz was trying to get Julie alone in a room, so Michael and the friend kept a watchful eye on the situation.

Julie's supervisor at work received complaints that Delacruz was "lingering around the pharmacy" in the waiting area and watching Julie work. Delacruz called the pharmacy several times while Julie was working, and Julie's "productivity wasn't going very well because he was totally trying to control every little situation." Delacruz's behavior became so distracting that Julie's supervisor had to kick him out of the store. Over the course of her separation from Delacruz, Julie confided in her supervisor. She said she was in fear for her life, that Delacruz had said that if he couldn't have Julie or L.D., nobody would, and that he followed her around in his car. Julie told her supervisor that "if anything ever happened to her, it was him."

Julie told her mother that she felt that Delacruz "was up to something." The last time she talked to her sister before her disappearance she kept repeating "that she had a bad feeling."

An inmate incarcerated with Delacruz after his arrest would later recount a conversation in which Delacruz admitted to physically assaulting a girlfriend and causing her to become unconscious.

### 3. *Julie's New Boyfriend*

Around the same time that she separated from Delacruz, Julie started to date Aaron Breaux, a man with whom she had shared an on-again, off-again relationship in the past. After running into

each other at a grocery store, Julie and Aaron rekindled their relationship through email and eventually started to see each other regularly.

About two or three months into her new relationship with Aaron, Julie began staying over at his apartment. Although Julie was initially cautious about bringing L.D. into her relationship with Aaron, the relationship soon evolved to a point where Julie was comfortable involving her daughter in her life with Aaron. Photographs showed Julie, Aaron, and L.D. together at the zoo, and Aaron's roommate was aware that Aaron sometimes took L.D. fishing. L.D. frequently stayed overnight at Aaron's apartment with Julie, where she also kept some of her daughter's belongings.

Josh Dear was Aaron's roommate of three years. According to Josh, Julie and Aaron were taking the prospect of building a future together seriously: they planned to eventually move into their own apartment; they discussed their financial situations; and they made itemized lists about how they could meet the bills at the end of the month. And they discussed the timing of their work schedules to figure out how to best care for L.D.

On March 25, 2010, Julie went to dinner with her friend Amanda and with Aaron. According to Amanda, Julie was "excited" and "overjoyed" at dinner. Julie and Aaron talked happily about their future and made plans to look at houses in which they could live together. After dinner, Julie and Aaron returned to Aaron's apartment where they watched a movie and stayed overnight.

### 4. *Delacruz's Disparaging Online Statements About Julie Before She Disappeared*

Delacruz had a page on the social media site "MySpace" and routinely posted messages there. On January 12, 2010, he posted a message regarding mistakes he made. He stated that "finding love was a big mistake but that mistake gave" him L.D., whom he loved. On January 22, he posted that he was "cleaning some old memories away." On February 23, he posted a message containing

obscenities; at midnight the next day, he sent an obscenity-laced email to Julie that complained about her making his life miserable. After Julie responded and pleaded with him to make L.D. a priority, Delacruz responded and accused Julie of being "the ugly person not me," saying that what she did was wrong, and claiming that Julie always blamed him but that he did not care because he knew what he had to do and "don't trust me anymore cause I don't want u too." Later, Delacruz posted to his MySpace page a message titled "Too Hard to Forget":

> When everything settles down and my fun stops all the shit returns it just don't go away. It's just hard to forget about it hate it cause I can't move on I tried and tried but it's not doing anything. I just miss the old times. I'm sorry so sorry.

Around midnight on March 7, Delacruz posted a message that "the way things r going its leaning toward my original plan." Appellant sent Julie another email and posted other material on MySpace that showed him to be aggravated and moody.

### 5. *Suspicious Circumstances on the Day Julie Disappeared*

Julie had the day off work on Friday, March 26, 2010, and she stayed at Aaron's house the night before. Julie tried to persuade Aaron to stay in with her that day, but he needed the work hours to pay bills. Aaron told Julie he loved her, kissed her goodbye, and left his apartment between 6:00 and 6:15 a.m., while Julie slept in for a bit longer. Julie planned to go to Delacruz's house later that morning to pick up L.D. with her cousin, Michael. But Michael had to work that day, so Julie went to Delacruz's house alone.

That morning, Delacruz and L.D. walked across the street to a neighbor's house. The neighbor, Joe Cruz, had been Delacruz's neighbor for nearly twenty years, but this was the first time Delacruz had come to his home and spoken to him. Delacruz told Joe that he was getting a divorce and that Julie had gone missing.

Aaron texted Julie throughout the morning of March 26, but did not receive any responses. He called Julie once in the morning and again around lunchtime. Around 2:00 p.m. that day, he received a text from Julie's phone that read something along the lines of "I can't do this anymore." Aaron testified at trial that it appeared to be a break-up text. He was surprised by the tone and content of the message and continued to reach out to Julie throughout the day. Aaron testified that he had a gut feeling that something was wrong, and he eventually grew suspicious that someone else was in possession of Julie's phone. It did not sound like Julie. As a test, Aaron sent a message to Julie's phone asking her to respond with his middle name, something that only she would know. The response he received from Julie's phone was, "I don't feel like playing games." Aaron responded that he needed to talk to Julie over the phone and that he wanted to hear her voice. When he called Julie's phone after he got off work, her phone was turned off.

Although Julie and Aaron did not live together, she kept some clothing and personal items at his apartment. Aaron thought it would be unusual for Julie to leave all of her stuff at his place if her intention was to break up with him later that day, so he returned straight home after work to see if Julie had packed up her things. All of Julie's and L.D.'s belongings were still at his place and he also found a love letter from Julie that she had placed on his pillow before leaving that morning. The letter read, in part:

> I started dreaming about when we first saw each other again. I looked at my calendar and it was 161 days ago. Can you believe it? I was like wow. I can honestly say they have been the happiest—well, I can't say the happest because our happiest days haven't come yet. Like the day we get married and have our little boy . . . I can't express to you how much I love you and how happy I am to be with you . . . I absolutely will marry you. I would be happy to . . . I still can't believe how lucky I am to be with you. You make me so happy. You are so special to me and there is no one else like you. You make me smile all the time. You make me feel special and loved . . . It's almost here. August. Like five months or so until we will be living

together.  I can't wait waking up together every morning . . .

Julie's friends and family were all alarmed that she was unreachable.  Everyone knew Julie to be dependable, punctual, and responsive—especially with family members.  Samantha, Julie's sister, testified that "if [Julie] wouldn't talk to one relative, then she would always talk to another relative.  She would—every day she would constantly talk to someone in the family."  Samantha recognized that something was wrong when Julie did not contact her at all on Friday.[9]  Julie's cousin, Alyssa Soto, also learned that Friday that Julie was missing.

Julie's friend Amanda became worried that Friday after seeing a post on Julie's Facebook page purporting to indicate that she wanted to run away.  Amanda felt "that something was really wrong" and that she needed to talk to her.

Natasha Navarro was in New Orleans on the day that Julie disappeared.  Amanda reached out to Natasha about "some weird stuff" that had been posted to Julie's online social media.  None of the messages resonated with Natasha, and she thought it was highly unusual.  After repeatedly and unsuccessfully attempting to get in touch with Julie, she received a text message from Julie's phone that stated: "I didn't love Aaron.  I thought I did."  To Natasha, that text message sounded like "something Julie would never say.  That sounds like something Delacruz would say."

Julie's aunt, Dora Soto, had plans to see Julie on the Friday she disappeared.  Julie told Dora that she would stop by for lunch or come by to see her at work, but she never showed up.  When Julie did not  answer her calls or texts, Dora "was immediately concerned because that was not her norm."  Dora promptly reached out to other family members to ask about Julie.

---

[9]  Samantha received an unusual text from Julie's phone that day referring to her as "S.P.," a nickname that not many people used.

Michael testified that he spoke with Julie every day, and that she always answered his calls "no matter what." Julie was supposed to pick Michael up from work that Friday afternoon, but when he called her after his shift, no one answered. He continued to call Julie's phone to no avail. Finally, he sent Julie a text asking her what was wrong, to which he received the response: "Nothing." Michael eventually asked his mother to pick him up from work, and they wondered together why Julie was not picking up her phone. They grew concerned and decided to drive by Delacruz's house to see if Julie's car was there "because that was the last place [they] knew she went that anyone had heard from her." Michael said, "It wasn't like Julie just not to talk to anybody."

According to a cell phone expert, Julie was "an above average user." In the months before she disappeared, Julie averaged between twenty-five and thirty inbound and outbound calls, forty and fifty texts, and sixty and seventy data connections per day. People who regularly spoke with Julie over the phone were unable to do so on the day she went missing. And even though no one spoke to her on that Friday, many of Julie's friends and family members received strange texts from Julie's phone on the day she disappeared. Some of these texts suggested that Julie was leaving Aaron and going to Colorado to see a man none of her friends or family had ever heard of.

There were also strange messages posted to Julie's online social media. Several posts to Julie's Myspace page that day purported to indicate that Julie had run away. At 12:29 p.m., Julie's account posted: "going away hate all this bs want to run away." At 7:06 p.m., the following message was posted to Julie's Myspace page:

> Everything Is so hard I hate hurting people I love I'm with the one I loved and I'm with the other one that I love. I hate how things turned out I just wish I never met them. I'm here miles and miles away from everybody hopefully I will find myself in these few days. He better show me a good time here and make me forget about everything in Austin. I don't want to go back and tell him I screwed up I'm so afraid but I'll see what happens.

On Saturday, March 27, 2010, the following message was posted to Julie's account at 1:57 a.m.: "really happy for leaving austin I love this place and I miss my ay bay bay."[10]  Other odd messages, purporting to suggest that Julie was alive, disillusioned, and running away, were posted at various times later that day.

### 6. *Delacruz's Uncharacteristic Gaming Inactivity*

Records from Microsoft corroborated testimony about Delacruz's obsession with video games.  Records from March to May of 2010 reflected that Delacruz was a "heavy gamer" who used his Xbox every day.  But Delacruz's Xbox activity was unusually silent during periods of time on March 25 through March 27—spanning the day before, the day of, and the day after Julie's disappearance.  The records revealed no Xbox activity from 11:45 p.m. on Thursday, March 25 through 8:23 p.m. on Friday, March 26.  And from 8:23 p.m. to 1:03 a.m., Delacruz's Xbox was left in "dashboard mode" (a sort of standby mode), which was by far the longest time recorded for the review period.[11]

### 7. *Delacruz's Suspicious Behavior and Statements to Law Enforcement*

Michael wanted to confront Delacruz at his home on Saturday night, because he "knew he did something."  Michael arranged for a friend to drive him to Delacruz's house, and when he knocked on the front door, Delacruz's little sister opened the door and told Michael that he was in the backyard with some other people.  Michael went around to the backyard to find Delacruz and

---

[10] The lead detective found the phrase "my ay bay bay" to be significant because Delacruz had used the same phrase in a post to his own Myspace page on February 10, 2010, which read: "Chillin' with my ay bay bay."

[11] The next longest time was less than two hours, and all other periods lasted only minutes or seconds.

some of his friends gathered around a shed and a table. When Michael instructed Delacruz to "come here," Delacruz approached him "just close enough" to where Michael could see his face. Michael testified that he saw scratches on the bridge of Delacruz's nose and near his eyes. On cross-examination, Michael testified:

> I didn't get that close. He wouldn't come out of the dark. The way it was, one side was lit up by security light; one side shaded, like, on the corner of the house. He wouldn't come where the security light was, where I was. He was in the shadows.

Delacruz's sister Liliana, Julie's mother Sandra, and police officer John Brooks also noticed scratches on Delacruz's nose. Delacruz told Sandra that the scratches were received from L.D. while "wrestling" but Sandra believed they were too deep to have been inflicted by a toddler.

Although Delacruz had told Joe Cruz on Friday morning that Julie had gone missing, he told an investigating officer that the first time he learned of Julie's disappearance was on Saturday night. In his statements to the police, Delacruz painted a very different picture of Julie, her family, and her friends than the police heard from anyone else. Delacruz suggested that Julie was on drugs when she stopped by his place before she disappeared. He claimed that she had a discordant relationship with her mother, who liked "drama," that Julie had "weird" friends who knew where she was, and that Julie's family "knows something that they don't want to give up." Delacruz suggested that Julie might have run away "just to get away from her problems." Delacruz made other statements to the police that were either false or deceptive, including statements about his efforts to call Julie, statements about when and how he discovered she was seeing Aaron, statements that Julie wanted to leave L.D. with him if she was planning to be away, and statements about being employed and having a work schedule. He also denied, untruthfully, that he had access to her MySpace account.

### 8. *Delacruz's Possession of Julie's Cell Phone after her Disappearance*

There was ample reason to believe that Delacruz was the true author of various baffling, out-of-character text messages and online media posts. Forensic analysis supported the conclusion that Delacruz had possession of Julie's cell phone between the morning of March 26 and the evening of March 27. Geolocation data showed that, during this time, the phone was at Delacruz's house for extended periods, was at the Wal-Mart at the time he used Julie's credit card (see below), was at Best Buy when he bought and returned various items there, was at a carnival he attended that weekend, and was at another house that Delacruz frequently visited. The length of time the phone was at Delacruz's home was highly unusual, as Julie would typically leave there within five minutes of arriving. Forensic analysis also showed that it was not possible that the phone was in Colorado; it had never left Austin. And a review of Julie's cell phone records established that her phone had never called another phone in Colorado or any phone with a Colorado area code. Julie's phone records reflected no additional activity after 11:46 p.m. on Saturday, March 27, and her phone was never recovered.

### 9. *Credit Card Charges*

Julie last used her credit card on March 25 at an HEB grocery store. Bank records showed the use of the card as a debit card (with a PIN entry), which was consistent with prior purchases. Surveillance video showed Julie at the store. On March 26, purchases were made with that card at a Wal-Mart and at a McDonald's inside the Wal-Mart. Contrary to prior practice, the card was used as a credit card (signature without a PIN entry). Surveillance video showed Delacruz and L.D. at the store during the transactions. One item purchased at the Wal-Mart was an Xbox playing card, which was activated by Delacruz later that night. Other items that were purchased were later found at Delacruz's home.

### 10. *Julie's Car is Found*

On Sunday, March 28, Dora found Julie's car at a Walgreen's less than half a mile from Delacruz's house. This was not the Walgreen's where Julie worked. A cashier working that night remembered a woman coming into the store, saying that she had car trouble, and asking if she could leave her car in the parking lot overnight. The cashier was unable to identify the woman from a series of photographs culled from store surveillance during that period. It was later determined that Julie's car was fully operational.

### 11. *No Sign of Julie Being Alive*

Law enforcement personnel made extensive efforts to discover any indication that Julie was alive. They searched credit reports, social media, telecommunication services, and the TCIC and NCIC databases. They contacted Homeland Security regarding any passport activity or international travel. The FBI ran several searches "against all the databases of every law enforcement agency in the country to see if anyone has run that name." Searches were conducted using Julie's personal information—her name, address, date of birth, social security number, license number, and property ownership—and received no "hits."

James Midkiff of the Austin Regional Intelligence Center conducted various searches that involved utility and insurance databases, visa and passport activity, assets, addresses, phone numbers, email addresses, associates, relatives, employment activity, facial recognition software, and land, sea, and airport check points. He prepared a "no proof of life packet" with the assistance of a Homeland Security agent.

Julie's family also made efforts to locate her and even appeared on nationally televised programs to ask viewers to report any information they might have regarding her whereabouts. None

of these efforts were successful.

### 12. *Freshly Dug Hole in Shed with Ashes Nearby*

On March 28, police discovered a freshly dug hole in a shed by Delacruz's home. The hole was five feet wide, five feet long, and two feet deep. There seemed to be no logical reason for the hole, but Delacruz claimed it was for plumbing to turn the shed into an apartment. Family members of Delacruz knew nothing about the hole and called the police upon discovering it on May 4. When Delacruz's mother asked Delacruz about the hole, he denied knowing anything about it, and he made no mention of the hole being dug for plumbing purposes.

Near the hole, there were several tools that appeared to have been used to dig it. Ammunition in a water bottle and "a few loose ones" were found nearby. A knife and blue latex gloves were found hidden under a picnic table in the backyard, and the police also saw "ashes and burned debris" on the ground near the shed that contained "some burned clothing . . . specifically what appeared to be . . . purple shoelaces." Cadaver dogs alerted at Delacruz's house and sniffed at some items in the shed, but no body was found.

This digging apparently damaged telecommunication cables. An AT&T service technician responded to reports of service outage on the morning of March 26. He determined that the outage was caused by damage to the underground cables located behind the playhouse in Delacruz's back yard. He explained that damage of this type is normally associated with construction work, so it was unusual for him to find nothing but a woodpile covering up the area. He stated that the cables appeared to have been "newly damaged."

## II. TRIAL AND APPEAL

Nisbett was convicted of murder and sentenced to forty-two years in prison. Delacruz was

convicted of murder and sentenced to life in prison.

In Nisbett's case, the court of appeals held that the evidence was legally insufficient to support the conviction and rendered a judgment of acquittal.[12] The court appeared to doubt that the State proved that Vicki was dead,[13] but assuming for the sake of argument that the State had proved her death with lack of evidence that she was alive, the court held that there was no evidence demonstrating that Nisbett caused her death.[14] Although the court of appeals acknowledged that the State could rely upon an unknown manner and means of death and that the jury was not required to unanimously determine what caused death, the court of appeals nevertheless faulted the State for not showing "what the fatal act was."[15] The court of appeals held that the blood found in the apartment was not enough to demonstrate that blood loss was the cause of death because the State's experts had indicated that not enough blood had been found to demonstrate a fatal blood loss.[16]

The court acknowledged that a number of suspicious circumstances existed—e.g., the blood in the apartment, the unusual cleanness of the apartment, the absence of any contact with Vicki by anyone who knew her since her disappearance, and that Vicki had children she would not have abandoned—but the court held that these circumstances were not evidence that Vicki was dead or

---

[12] *Nisbett v. State*, No. 03-14-00402-CR, 2016 Tex. App. LEXIS 13252 *52 (Tex. App.—Austin Dec. 15, 2016) (not designated for publication).

[13] *Id.* at *29-30.

[14] *Id.* at *30.

[15] *Id.* at *31-34.

[16] *Id.* at *32-33.

of who caused her death.[17]   The court also acknowledged that Nisbett engaged in a number of instances of suspicious behavior—e.g., making threatening comments about Vicki, writing a check on Vicki's bank account after she disappeared, borrowing a car from a neighbor that night, telling various lies about his or Vicki's conduct that night and about his own conduct after her disappearance—but the court held that this evidence showed guilt only when linked to wrongful conduct and that there was no proof that wrongful conduct had occurred.[18]

Finally, the court of appeals held that, even if it accepted the inference that Vicki was dead and the "further speculative inference" that Nisbett "somehow caused her death by some unknown and unidentified act," the evidence remained insufficient to support the conviction because the evidence failed to demonstrate that Nisbett had the requisite culpable mental state for murder.[19]   The court concluded that the evidence did not establish either that Nisbett "intentionally or knowingly" caused Vicki's death or that Nisbett intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused her death.[20]

In Delacruz's case, however, the court of appeals concluded that the evidence was legally sufficient to support a conviction for murder.[21]   The court acknowledged that no single piece of evidence definitively proved that Delacruz murdered Julie but concluded that the cumulative force

---

[17]   *Id.* at *35-38.

[18]   *Id.* at *38-44.

[19]   *Id.* at *45.

[20]   *Id.* at *45-49.

[21]   *Delacruz v. State*, No. 03-15-00302-CR, 2017 Tex. App. LEXIS 3563, *83 (Tex. App.—Austin April 21, 2017) (not designated for publication).

of the evidence was sufficient to show that he did so.[22]

The court pointed to Julie's character and circumstantial evidence to establish that she was dead—that Julie had close relationships, had made short and long term plans, would not have left her child, did not take any belongings or withdraw any bank funds, and engaged in no other activity, such as establishing new accounts or utilities, obtaining or disposing of assets, or traveling, that would suggest that she was still alive.[23] The court of appeals also relied upon various items of circumstantial evidence to support the conclusion that Delacruz murdered Julie.[24] The court pointed to his physically and verbally abusive and controlling behavior toward her during their marriage.[25] It cited Delacruz's opposition to the divorce and his threatening and irrational behavior during the couple's separation.[26] The court further pointed to Delacruz's uncharacteristic gaming inactivity around the time of Julie's disappearance, the hole he dug in his back yard, the ash and the burned clothing, his possession of Julie's phone and the messages he sent from that phone, his use of her credit card, the misleading and inconsistent statements he made throughout the investigation to law enforcement, family, and other individuals, and Delacruz's own statements about having committed a violent act against Julie.[27] In responding to Delacruz's arguments, the court of appeals emphasized that circumstantial evidence could be used to support a conviction and that the State was not required

---

[22] *Id.* at *69-70.

[23] *Id.* at *70-71.

[24] *Id.* at *71-78.

[25] *Id.* at *71.

[26] *Id.* at *71-72.

[27] *Id.* at *72-76, 83.

to prove how Delacruz caused Julie's death.[28]

Delacruz relied on the court of appeals's reversal in Nisbett's case, but the court of appeals responded that the question of whether the evidence is sufficient to commit the charged offense "is a highly individualized inquiry" and that the "evidence in this case is quantitatively and qualitatively different from that presented in *Nisbett*."[29]  One point of distinction the court of appeals seems to have found in the two cases is that Delacruz's description to an inmate of causing his girlfriend to become unconscious could have been viewed by a rational jury as a partial description of the murder (though Delacruz did not admit that it was such and it could have been an extraneous offense)[30] while Vicki's description of Nisbett choking her could not have been a description of her murder because she survived that incident.[31]  However, the court of appeals in *Delacruz* did not make the jailhouse informant's testimony the lynchpin of its analysis but simply considered it as "additional evidence."[32]  The court noted that the jailhouse-informant evidence was governed by the corroboration requirement in Article 38.075[33] but that the record "contains substantial evidence that

---

[28]  *Id.* at *78-80.

[29]  *Id.* at 82-83.

[30]  *See id.* at *79 ("But the State was not required to produce testimony showing that Delacruz admitted to every element of the charged offense. . . .  Accordingly, Stewart's testimony was additional evidence that tended to show that Delacruz committed violent acts against Julie that caused her to bleed and lose consciousness.").  *See also id.* at *67-69.

[31]  *See Nisbett*, 2016 Tex. App. LEXIS 13252, at *29-30 ("Moreover, the evidence reflects that [*30]  Vicki was alive and talking on the phone—first to Tower then later to Castleberry—after appellant choked her.  Thus, the choking Tower heard about was not a fatal injury.").

[32]  *Delacruz*, 2017 Tex. App. LEXIS 3563, at *79.

[33]  TEX. CODE CRIM. PROC. art. 38.075.

tends to connect Delacruz with the offense committed."[34]

## III. ANALYSIS

### A. General Principles of Sufficiency Review

Due process requires that the State prove, beyond a reasonable doubt, every element of the crime charged.[35]  In reviewing the sufficiency of the evidence, an appellate court must ask whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[36]  This standard gives full play to the responsibility of the factfinder "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."[37]  An appellate court cannot act as a thirteenth juror and make its own assessment of the evidence.[38]  A court's role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally.[39]

It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt.[40]  Each fact need not point directly and

---

[34] *Delacruz*, 2017 Tex. App. LEXIS 3563, at *79.

[35] *Jackson v. Virginia*, 443 U.S. 307, 313 (1979).

[36] *Id.* at 319.

[37] *Id.*; *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014).

[38] *Cary v. State*, 507 S.W.3d 761, 766 (Tex. Crim. App. 2016).

[39] *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016).

[40] *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*,

(continued...)

independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction.[41] Because evidence must be considered cumulatively, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence.[42]

### B. The Evidence was Legally Sufficient to Support Both Convictions

### 1. *The Cases are Similar*

Nisbett's and Delacruz's cases are similar in a number of ways. In both cases, there was no eyewitness to murder, no confession by the defendant to murder, no body recovered, and no murder weapon found. In both cases, the victim disappeared, never to be seen or heard from again. For each case, the State introduced evidence of the complete absence of any economic or electronic footprint involving the victim or her social security number—no property transactions, bank account activity, utility bills, phone bills, driver's license renewals, vehicle registrations, or the like. In both cases, the victim was in a troubled marital relationship headed for divorce, the victim's husband had a history of abusive and violent behavior toward the victim, the day the victim disappeared involved suspicious events, the victim's activity or lack of activity on that date was out-of-character and out of line with intentions and goals expressed earlier, and the husband expressed animus about the victim before the victim disappeared and made suspicious and inconsistent statements after her disappearance. In both cases, the husband attributed statements to the victim that the victim did not make (Nisbett making conflicting statements about Vicki's departure for the Christmas party and

---

(...continued)
214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

[41] *Hooper*, 214 S.W.3d at 13.

[42] *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

Delacruz impersonating the victim in text messages and online media). In both cases, the estranged husband used an account owned by the victim to pay for something after the victim had disappeared (a bank check in Nisbett's case and a credit card in Delacruz's case). In both cases, the victim's car was found. And both cases involved physical evidence that supported a conclusion that the victim was murdered (carpet padding stained with Vicki's blood and the hole dug with ashes and burned clothing nearby in Delacruz's back yard).

Although we agree that a sufficiency of the evidence inquiry is highly individualized, we disagree with the court of appeals's statement in Delacruz's case that the evidence in the two cases was quantitatively and qualitatively different. While the cases are not identical and each has various strengths and weaknesses in the evidence, we nevertheless conclude that the cases are similar and should have been decided the same way. And because we decide that the correct decision in both cases was to uphold the trial court's judgment, we agree that Delacruz's case was decided correctly while we disagree with the resolution of Nisbett's case.

### 2. *Evidence Showed that the Victims Are Dead*

We start with the question of whether the evidence was sufficient to show in each case that the victim was dead. The possibility that a defendant could be convicted of murder when the victim is not even dead has been one motivation for adopting the *corpus delicti* rule, which requires that a defendant's extrajudicial confession be corroborated by some other evidence showing that a crime has been committed.[43] Past cases have sometimes required a showing of *corpus delicti* outside the

---

[43] *Salazar v. State*, 86 S.W.3d 640, 644 (Tex. Crim. App. 2002) ("The *corpus delicti* rule guarded against the shocking spectacle and deleterious effect upon the criminal justice system when a murder victim suddenly reappeared, hale and hearty, after his self-confessed murderer had been tried and executed.").

extrajudicial confession context, but we have retreated from those cases and have held that any such uses of the *corpus delicti* rule have been superseded by the sufficiency-of-the-evidence standard articulated in *Jackson v. Viriginia*.[44]

Even when the *corpus delicti* rule applies, the *corpus delicti* of murder is established "if the evidence shows the death of a human being caused by the criminal act of another, and the State is not required to produce and identify the body or remains of the decedent."[45] The State's possession of a dead body can make proving the victim's death easy, but the victim's death can be proved through other evidence, even if that evidence is circumstantial.[46] "The notion that the careful and meticulous murderer might escape punishment by destroying or forever concealing the body of his victim is a distasteful one," and the murderer's successful disposition of the victim's remains should not be rewarded.[47]

And partly for this reason, it need not necessarily be known what caused the victim's death.

---

[44] *Carrizales*, 414 S.W.3d at 742-44 ("Mention of the *corpus-delicti* doctrine in a *Jackson* sufficiency review when the case does not involve a confession is, at best, just short hand for 'evidence that the crime has been committed,' and, at worst, confusing.").

[45] *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).

[46] *See id.* (emphasizing that sufficiency of the evidence to prove *corpus delicti* in a murder case requires considering *all* of the evidence). *See also Belcher v. State*, 71 Tex. Crim. 646, 654, 161 S.W. 459, 463-64 (1913) ("Outside of the confession or statement of the appellant hereinafter mentioned, and even therewith, the State was under the necessity, by circumstantial evidence very largely, of establishing the identity of this dead body as that of W. R. Belcher, and that the appellant had murdered him. In such cases as this, courts and text-writers all say: 'The mind seeks to explore every possible source from which any light, however feeble, may be derived. And in such cases the nature of the case in many instances demands a greater latitude in the presentation of the evidence of the circumstances than where a conviction is sought upon direct and positive testimony.'") (citations omitted).

[47] *McDuff*, 939 S.W.2d at 623 (Baird, J., concurring) (citing *Epperly v. Commonwealth*, 224 Va. 214, 294 S.E.2d 882, 891 (Va. 1982)).

"[T]he cumulative force of all the incriminating circumstances" can support a murder conviction even if "the evidence did not prove the method of commission of the offense."[48]  Evidence of how a victim died would likely be helpful in proving that the victim is dead (as well proving other elements of murder), but the ultimate  question is whether the evidence, when viewed as a whole, is sufficient to establish the victim's death.[49]

In the cases before us, neither of the victims' bodies were found, but there was a significant amount of circumstantial evidence that each victim was dead.  To begin with, each victim failed to make appointments that had been planned.  Vicki had made plans to meet a co-worker, attend a Christmas party, and go on a date afterwards.  Julie had planned to go to lunch with her aunt and to pick up her cousin from work.  None of these planned meetings occurred.

For each victim, a voluntary disappearance would have been out of character and inconsistent with the victim's plans and circumstances.  People who knew Vicki testified that she was a good mother who would not have abandoned her three children.  A police officer also noted that all of Vicki's personal effects were still in her bathroom.  Julie was well known as a responsible person, she had a child of her own who was very important to her, and she had close relationships with a number of relatives and friends and had contacts with a number of these people on a daily basis. Julie was also a model employee who was never late for work.  Julie had seemed excited about a future with her boyfriend, and in fact, wrote a love letter to him the day she disappeared.  This was inconsistent with text messages and social media postings occurring later that day that suggested she was breaking up with him.

---

[48]  *Ramos v. State*, 407 S.W.3d 265, 271 (Tex. Crim. App. 2013).

[49]  *See McDuff*, 939 S.W.2d at 614-15 (Court's op.).

Family and friends of the victims never heard from them again. In fact, a thorough search of various databases revealed no economic or electronic activity by either of the victims, or any other sign that the victims were alive. Both of the victims' cars were recovered, having been abandoned. As far as anyone could tell, each victim had disappeared from the face of the earth. "[I]t is less likely in today's mobile and technological society that a person might vanish and never be heard from again."[50] The absence of economic activity or any contact with family and friends supports a conclusion that the victim is dead.[51] In Vicki's case, this absence of activity was over an extended period of time—more than 22 years. In Julie's case, the absence of activity was not over as long a period but was nevertheless highly significant, given her history of extensive cell-phone usage.

One possible explanation, besides murder, for such a thorough disappearance under suspicious circumstances is a kidnapping, with the victim being held prisoner for years in a hidden location. There are anecdotes of victims disappearing only to emerge alive later from an extended captivity: e.g., Jaycee Dugard, Amanda Berry, Michelle Knight, and Georgina DeJesus. However, there is evidence that undercuts such an explanation in the cases before us and that supports, instead, the conclusion that Vicki and Julie were both killed. As we shall see in the next section, the evidence strongly points to each defendant as being the cause of the disappearance of his respective victim.

Moreover, there was physical evidence suggesting that each victim had died. In Nisbett's case, Vicki's blood had soaked through the carpet and into the carpet padding. That fact suggests that Vicki lost a lot of blood—suggesting that her wounds were fatal. Even though experts testified

---

[50] *Id.* at 623 (Baird, J., concurring).

[51] *See id.* at 615 (Court's op.).

that they could not say that a fatal amount of blood was found, the evidence also showed that, after Vicki's disappearance, her apartment was immaculate. This was contrary to the apartment's usual messy condition, and the natural inference to draw is that Nisbett cleaned the apartment thoroughly, wiping up most of the blood.

In Delacruz's case, there was the freshly dug hole in the shed in his back yard—a hole large enough to put a body in. There was no legitimate reason for the hole, and Delacruz lied to his family and the police about it. In addition, there were ashes nearby, as well as burned clothing, and cadaver dogs alerted at the house and on some items in the shed. This suggests that Delacruz burned Julie's body in the back yard and at least attempted to dispose of it there.

### 3. *Evidence Strongly Connected Each Defendant to the Respective Victim's Disappearance*

We now turn to the fact that the evidence strongly connected each defendant to the respective victim's disappearance. While motive is not by itself enough to establish guilt of a crime,[52] it is a significant circumstance indicating guilt.[53] Opportunity, when coupled with motive, is not sufficient to prove identity in a murder prosecution but is indicative of guilt.[54] Marital difficulty can establish a motive for murder.[55] Prior behavior by the defendant toward the deceased can also be relevant to

---

[52] *Hacker v. State*, 389 S.W.3d 860, 870-71 (Tex. Crim. App. 2013).

[53] *Ex parte Weinstein*, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014).

[54] *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013).

[55] *Goff v. State*, 329 Ark. 513, 520, 953 S.W.2d 38, 42 (1997); *State v. Winfrey*, 337 S.W.3d 1, 11 (Mo. 2011).

a determination of whether the defendant murdered the victim.[56]   And inconsistencies in a defendant's story can provide evidentiary support for a conviction.[57]   And of course, other circumstantial evidence, such as physical evidence[58] or electronic evidence, can link a defendant to the commission of an offense.

In both Nisbett and Delacruz's cases, the defendant and the victim had a troubled marriage and divorce was pending.  In both cases, the victim was extremely fearful of the defendant.  Vicki expressed her fear of Nisbett to her pastor, while Julie expressed her fear of Delacruz to her supervisor at work.  In both cases, the defendant expressed great animus about his wife in remarks before her death.  Nisbett talked about killing Vicki, while Delacruz called Julie a "big mistake" that made his life miserable and used obscenity-laced language to describe her.  Nisbett talked about a place where a body could be disposed of where no one would ever find it, while Delacruz posted a message, along with his derogatory remarks about Julie, that he was leaning "toward [his] original plan."

In both cases, the defendant was the last person to see the victim alive, and in both cases the defendant's behavior on the day the victim disappeared further implicated the defendant in that disappearance.  On the day she disappeared, Nisbett argued with Vicki, because he did not want her to go to the Christmas party, and he physically assaulted her, leaving choke marks on her neck.  Nisbett's behavior greatly upset Vicki, and at one point, he coerced her to hang up the phone.  Despite the fact that he was supposed to be babysitting the children while Vicki attended the party,

---

[56]  *Garcia v. State*, 201 S.W.3d 695, 702-05 (Tex. Crim. App. 2006).

[57]  *Temple v. State*, 390 S.W.3d 341, 361 (Tex. Crim. App. 2013).

[58]  *Strickler v. Greene*, 527 U.S. 263, 293 (1999).

Nisbett left the children that night with neighbors who were more acquaintances than friends, borrowed the neighbors' car, and brought the car back damaged. Nisbett filed a missing persons report, but only after Vicki's supervisor stated that she would do so.

Delacruz went over to a neighbor's house for the first time in twenty years to tell him that Julie was missing. He did this in the morning, around or shortly after the time Julie was scheduled to pick up her child. Yet he never filed a missing persons report with the police. Even though Delacruz was a video game addict, his video game activity was uncharacteristically silent that day and the day after.

Both defendants made suspicious statements and engaged in other suspicious behavior after their respective wives disappeared. Nisbett called up Tower and hung up when Tower asked what he did with Vicki. He limited his children's time with their maternal grandmother to, in his words, "protect himself." Nisbett showed up twice while investigators searched Vicki's apartment and, visibly sweating, appeared to be extremely nervous. He gave various stories about where he thought Vickie would be, claimed to hire a private investigator but apparently did not, and initially denied having a physical altercation with Vicki on the evening of her party. He also claimed he stayed home with the children the entire night that Vicki disappeared, which contradicted his neighbors' account that he had left his children with them and borrowed their car.

Delacruz told investigating officers that he first learned that Julie was missing the night of her disappearance, despite his earlier statement to a neighbor that morning. Delacruz also described Julie, her family, and her friends in negative terms that were inconsistent with all of the other information the police had received. Delacruz claimed that he did not have access to Julie's social media account even though he did, because he had her phone. He told lies about the hole that had

been dug in his back yard.

Physical and electronic evidence also connected each defendant to his respective wife's disappearance. Vicki's blood on a wall in her apartment was imprinted with Nisbett's handprint. Nisbett forged a check after Vicki's disappearance. That check was out of sequence numerically, and the checkbook that the check came from was found in Vicki's car. Vicki's car was seen traveling the evening she disappeared and was later recovered, having been abandoned.

On the night of Julie's disappearance, Delacruz had a scratch on his nose that he attributed to his child but that was too deep for a toddler to make. He had Julie's phone and credit card on the day of her disappearance and he used both. He used the phone to send text messages and to post online media messages that suggested that Julie was breaking up with her boyfriend and running away. He used the credit card to make purchases, including a video-game playing card that he later activated.

### 4. *Evidence Was Sufficient to Show Each Defendant's Culpable Mental State*

By its nature, a culpable mental state must generally be inferred from the circumstances.[59] We cannot read an accused's mind, and absent a confession, we must infer his mental state from his "acts, words and conduct."[60] The culpable mental state for murder can be inferred from a defendant's motive, his attempts to conceal the body, and implausible explanations to the police.[61]

---

[59] *In re State ex rel. Weeks*, 391 S.W.3d 117, 125 n.36 (Tex. Crim. App. 2013); *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991).

[60] *See Hernandez*, *supra* ("Intent may be inferred from acts, words and conduct of accused.").

[61] *Weinstein*, 421 S.W.3d at 668.

The defendant's culpable mental state may also be inferred from the extent of the victim's injuries.[62]

Even though we do not know how Vicki died, the evidence shows that she lost a lot of blood. The evidence also shows that, shortly before her disappearance, Nisbett had grabbed Vicki around the neck in a choking motion, which was potentially life threatening. Vicki may have survived that encounter, but a rational jury could view the choking as indicative of Nisbett's mental state. There was also evidence that, in the days preceding her disappearance, Vicki was extremely fearful of Nisbett—suggesting a well-founded fear that he was going to kill her. Moreover, Nisbett had previously made statements that specifically indicated a desire to murder Vicki, especially if she tried to leave him. Vicki's filing for divorce and seeing another man supplied Nisbett with motive to kill her—a motive that he had previously articulated—though such a motive would have been evident even without Nisbett saying so. Nisbett also made suspicious and implausible statements to the police. His statement that McDuff killed Vicki could have been seen as an acknowledgment that Vicki was in fact murdered. Nisbett also engaged in extensive efforts to cover up Vicki's death, including meticulously cleaning the apartment, using a neighbor's car the night of her disappearance (possibly to dispose of her body), isolating his children from family, and attempting to mislead others about what happened to Vicki.

We also do not know how Julie died, but her pending divorce from Delacruz supplied him with a motive to kill her, and Delacruz's numerous online derogatory statements about her also indicated a motive to kill her. Julie's statement to her work supervisor further substantiated this motive when she referred to Delacruz saying that if he could not have her, "nobody will." Moreover, her statements to her work supervisor that she was in fear for her life, and that "if anything ever

---

[62] *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995).

happened to her, it was him," could be construed by a rational jury as a well-founded fear that Delacruz was going to kill her. A rational jury could also have interpreted Delacruz's admittedly cryptic statement that he was "leaning toward [his] original plan" as a veiled expression of an intent to kill her. The hole dug in the shed in his back yard was further evidence of such preparations. In addition, Delacruz engaged in an elaborate scheme to impersonate Julie in text messages and online to convey the impression that Julie had run away with another man. The ashes and burned clothing could be construed as an effort to cover up his crime.

## IV. CONCLUSION

We conclude that the evidence was sufficient to establish that Nisbett murdered Vicki and that Delacruz murdered Julie. Consequently, we reverse the judgment of the court of appeals in Nisbett's case and remand the case to that court to address Nisbett's remaining points of error. We affirm the judgment of the court of appeals in Delacruz's case.

Delivered: June 27, 2018

Publish