**Affirmed and Memorandum Opinion filed July 11, 2019.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-17-00607-CR

---

**LEROY STOOTS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 248th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1517329**

---

## MEMORANDUM OPINION

Appellant Leroy Stoots appeals his murder conviction, challenging in a single issue the sufficiency of the evidence to support the conviction. We affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Charged by indictment with the murder of the complainant Kumba "Marie" Sesay, appellant pleaded "not guilty." A jury trial followed with several witnesses testifying to the events before and after the murder.

Trial evidence showed that on the morning of July 3, 2016, a boy discovered the complainant's body in a ditch near Jones High School. The complainant had suffered a gunshot wound to her head. Houston Police Department investigators responding to the scene found blood and brain matter in the roadway leading to the ditch. The autopsy revealed the complainant had been shot at very close range.

Appellant and the complainant had shared a romantic relationship. At times, the two had lived together, but trial evidence showed that the complainant had planned to leave appellant the weekend she was murdered. Two days after the murder, the Fire Department found the complainant's car burning. The backseat contained a large amount of clothing, consistent with the complainant moving her belongings to a new location.

Appellant's cousin testified that before the complainant's murder, appellant called him and related relationship problems, specifically sharing that appellant and his girlfriend had been "getting into it and . . . she put him out." The cousin testified that appellant later confessed to murdering the complainant.

A jury found appellant guilty as charged. The trial court found the allegations alleged in the enhancement paragraph "true" and sentenced appellant to confinement for life.

## II. SUFFICIENCY OF THE EVIDENCE

In evaluating a challenge to the sufficiency of the evidence supporting a criminal conviction, we view the evidence in the light most favorable to the verdict. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). The issue on appeal is not whether we, as a court, believe the State's evidence or believe that appellant's evidence outweighs the State's evidence. *Wicker v. State*, 667 S.W.2d 137, 143 (Tex. Crim. App. 1984). The verdict may not be overturned

2

unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). The jury "is the sole judge of the credibility of the witnesses and of the strength of the evidence." *Fuentes v. State,* 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). The jury may choose to believe or disbelieve any portion of the witnesses' testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). When faced with conflicting evidence, we presume the jury resolved conflicts in favor of the prevailing party. *Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). Therefore, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).

The indictment alleged that (1) appellant intentionally and knowingly caused the complainant's death by shooting her with a firearm, and (2) that appellant intended to cause serious bodily injury and intentionally committed an act clearly dangerous to human life that caused the complainant's death by shooting her with a firearm.

A person commits murder if the person intentionally or knowingly causes the death of an individual, or if the person intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. *See* Tex. Pen. Code Ann. § 19.02(b)(1), (2) (West 2019). The trial court's instructions tracked the indictment in the disjunctive, and the instructions were consistent with the language for a murder offense under the Penal Code.

Though appellant challenges the sufficiency with respect to all elements, the thrust of his complaint is twofold: (1) the record contains insufficient evidence identifying him as the complainant's killer and (2) the cousin who testified that appellant confessed to the murder was not credible.

3

The State may prove a defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). A lack of direct evidence is not dispositive of the issue of guilt. *Id.* Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can suffice. *Id.* A jury may infer intent from any facts that tend to prove its existence, including the acts, words, or conduct of the accused, and the method of committing the offense. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).

Evidence places appellant with the complainant throughout the weekend of the murder. Don Hilliard, the owner of the radio station for which appellant and the complainant worked, testified that he saw appellant and the complainant leave together on Friday, July 1, in the complainant's new car, a Volkswagen Beetle. One of the complainant's friends, Casey Champagne testified that later that same evening — at 11:30 p.m. or 11:45 p.m. — appellant and the complainant stopped by her apartment to retrieve a bag the complainant had left there. Shykerla Hearne, a close friend of the complainant, testified that she spent Saturday, July 2, with the complainant, and part of that time was with appellant. In sum, Hilliard, Hearne, and Champagne presented testimony placing appellant and the complainant together throughout the weekend. Appellant's friend Derric Brown testified that after midnight on July 3, appellant was carrying a gun, driving the complainant's car, and stopping near Jones High School, where the complainant's body was found the next day.

According to Brown, on July 3, around 12:40 a.m., appellant called him from outside of Brown's house. Brown was not home at the time. Appellant told Brown that he needed him, and "whatever you do, don't get off the phone."

Brown drove home and when he pulled into his parking spot, appellant parked a blue Volkswagen Beetle behind him. Appellant then came up to Brown's car with a gun in his hand. Brown testified that appellant told him, "Man, I f ***ed up." Appellant tried to convince Brown to go to a bar with him to talk. When Brown would not go, appellant put the gun to Brown's head and said, "I'll kill you and I'll kill myself." Brown asked not to be killed and agreed to join appellant. According to Brown, appellant then said, "Man, just get in the car, I tell [sic] you where to go." Brown got back in his car and appellant got back in the Volkswagen Beetle. Appellant then directed Brown over the phone as they drove in separate cars.

Brown's then-girlfriend testified that Brown texted her to follow him when he went to meet appellant because Brown was concerned. The girlfriend followed at a distance, but, at one point, she pulled up next to appellant at a red light. She did not know appellant and she claimed appellant did not know her. She provided a consistent description of appellant and testified that he was driving a blue Volkswagen Beetle.

Brown stated that near Jones High School appellant told him "Hold up, man, I have got to piss." Brown testified that he refused to stop, thinking appellant would kill him, and instead drove on to a nearby stop sign while appellant stopped.

Appellant told Brown he wanted Brown to take him to appellant's mother's house but first appellant needed to "bring this little bitch back her car." Brown later picked appellant up at a gas station. Brown identified the boots appellant had been wearing that night. The medical examiner determined the boots contained the complainant's blood.

Appellant's cousin, Darrell Isles, gave testimony about appellant's whereabouts the following morning. Evidence showed that in the early morning of July 3, appellant made two phone calls to Darrell Isles's phone. The calls lasted

5

less than 10 seconds. Phone record data showed that later that day, Isles's phone traveled to the area where Isles's sister, Rhonda Isles, lived; and Darrell Isles testified that he saw appellant when he was at Rhonda's house. Isles explained that he gave appellant a pair of shoes at that time and also provided appellant with a change of clothes. According to Darrell Isles, appellant was wearing "like work boots, cargo boots" which were left at Rhonda's house and placed in the laundry room. Other witnesses also testified that near the time of the murder they saw appellant wearing these boots. The police retrieved the pair of boots from Darrell Isles' sister's home. Bracelets were found in the boots that appellant was identified as wearing in pictures posted of him on the radio station's Facebook page. A forensic analyst with the Houston Forensic Science Center testified that blood found on the boots "came back to [the complainant]." Darrell Isles testified that appellant confessed to murdering the complainant:

Q. Okay. Did the defendant ever tell you about his girlfriend, what happened to his girlfriend?

A. His girlfriend that's -- the new girl -- the girlfriend -- we seen it on the news what happened to the girl before then. You know what I'm saying? So I only seen that girl probably like one time over my life.

Q. Okay. That girl that was talked about in the news reports, did the defendant tell you what happened to her?

A. She was murdered.

Q. Did he say who did it?

A. Yes.

Q. What did he say?

A. He say he done it.

Q. He said he killed her?

A. Yes.

Q. Did he say how he did it?

A. That particular time, yes.

Q. What did he say?

A. That they got into a fight, or something. From the fight, he shot her, or something like that.

Q. He said he shot her?

A. Yes.

Q. Did he say what happened to her body?

A. I ain't asked him all them questions like that because like . . .

Q. I understand, but did he say what happened -- what he did with the body?

A. No -- oh, yes. They had drug the body by Jones or something.

Q. That he did what with the body?

A. They brought the body by Jones, the high school, whatever it was.

Q. Okay. Jones High School in South Park?

A. Yes, sir.

Appellant complains that the medical examiner's evidence was inconsistent with the confession Darrell Isles originally provided to investigators — that appellant told Isles that he had given the complainant "handlebars," beaten her, and then shot her. According to appellant, the medical examiner's report did not indicate the presence of "handlebars" in the complainant's body and the medical examiner testified that the abrasions on the complainant's body likely were caused from being dragged on the pavement. But no evidence revealed whether the toxicologist tested for "handlebars," or whether "handlebars" are derived from any of the substances for which the toxicologist did test. The medical examiner also testified that abrasions on the complainant's hip could be consistent with blunt force trauma. To the extent the record contains conflicting evidence as to the source and cause of the abrasions, this court presumes the trier of fact resolved conflicts in favor of the prevailing party. *See Turro*, 867 S.W.2d at 47.

Appellant points to a lack of video evidence. The homicide detective,

Officer Perez collected surveillance video from Jones High School. The video, admitted into evidence at trial, showed the ditch where the complainant's body was found. Consistent with Brown's testimony, the video captured two vehicles coming into view at 1:48 a.m. on July 3, 2016. Though the vehicles were not identifiable, the video shows one vehicle stopping and the passenger door opening. A person pulls something from the passenger side of the vehicle and then goes out of view by 1:50 a.m. Another set of videos taken from surveillance cameras near where the complainant's car was found confirmed that the vehicle was dropped off after 2:07 a.m. on July 3, 2016, and that someone set the car on fire on July 5, 2016.

Other evidence included the following: (1) Darrell Isles' testimony that he overheard appellant and his daughter talk about needing to return to "Scott and Blodgett" to set the car on fire and get rid of the evidence; (2) Hilliard's testimony that appellant told him in a phone conversation on July 4, 2016, that he was going with the complainant's mother to identify the complainant's body, an event which the medical examiner confirmed did not occur and would not have occurred; and (3) testimony about relationship difficulties between appellant and the complainant. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt."); *Nisbett v. State*, 552 S.W.3d 244, 265–66 (Tex. Crim. App. 2018) ("While motive is not by itself enough to establish guilt of a crime, it is a significant circumstance indicating guilt. . . Marital difficulty can establish a motive for murder.").

Appellant complains that two witnesses, Gladys Ibarra and Jose Ramos, did not identify him or provide testimony as to who caused the complainant's death.

Ibarra testified that sometime between 11:00 p.m. and midnight, she saw from a monitor in her living room a vehicle stopping in front of her house. She heard what she thought was a gunshot. She peered out her window and saw a dark-colored Volkswagen. The car's wipers were on and she saw a single person in the vehicle "like going crazy, waiving his hands." She heard a door slam, and the vehicle then quickly reversed and sped off. The next day her husband found the complainant's blood-splattered government identification card in their front yard.

A forensic analyst with the Houston Forensic Science Center testified about the results of DNA testing on a swab from the Volkswagen's door, a gold bracelet found on the complainant's body, the complainant's undergarment, the lanyard with identification card (found by Ramos), and the complainant's fingernail scrapings. Appellant was excluded as a DNA contributor for the fingernail scrapings and clippings. The forensic analyst found no male DNA from vaginal, rectal, or oral samples taken from complainant's body. The lanyard and identification card were insufficient for interpretation. The undergarment stain contained a partial mixture of Y-STR DNA from at least two males, but no comparison was done to identify appellant or anyone else as a contributor. Appellant was excluded as a contributor of the DNA left on the driver-side door of the complainant's Volkswagen; but the complainant was not excluded. At trial, cell-phone evidence substantiated many of the witnesses' accounts. Though the evidence did not pin appellant with precision to any place, the evidence showed that appellant's cell phone, the complainant's cell phone, and other relevant witnesses' cell phones were in the vicinities and corroborated testimony about when a call or text was made, sent, or received. The State's phone expert explained that he could not offer more than phone locations; he was not representing that the phone records showed the location of appellant, the

complainant, or any of the other individuals. Appellant's phone was never retrieved. Appellant's cousin, who told police of appellant's confession to the murder, testified that the cousin's fourteen-year old son damaged appellant's phone and threw it down a drain.

Viewing the totality of the evidence, we conclude that the jury reasonably could have found that appellant remained with the complainant throughout the evening of July 2, and that he used the gun he was seen carrying to shoot the complainant in her car in front of the Ibarra-Ramos residence. Likewise, the jury reasonably could have concluded that by appellant's use of the gun, his efforts to conceal the complainant's body, and other evidence, he intentionally or knowingly killed the complainant. *See Guevara*, 152 S.W.3d at 50. Under the applicable standard of review, a rational trier of fact could have found beyond a reasonable doubt that (1) appellant intentionally or knowingly caused the complainant's death by shooting her with a firearm, or (2) appellant intended to cause serious bodily injury and intentionally committed an act clearly dangerous to human life that caused the complainant's death by shooting her with a firearm. *See id*.

### III. CONCLUSION

We conclude the evidence is sufficient to support appellant's murder conviction on each of the essential elements. Accordingly, we overrule appellant's sole issue and affirm the trial court's judgment.

/s/     Kem Thompson Frost
Chief Justice

Panel consists of Chief Justice Frost and Justices Jewell and Bourliot.

Do Not Publish — TEX. R. APP. P. 47.2(b).

10