# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-18-00755-CR

---

**Tutankhamun Holt, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 27TH DISTRICT COURT OF BELL COUNTY
NO. 76732, THE HONORABLE JOHN GAUNTT, JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

A jury convicted appellant Tutankhamun Holt of the first-degree felony offense of aggravated kidnapping, *see* Tex. Penal Code § 20.04, and assessed his punishment at confinement for life, *see id.* § 12.32. Raising three issues, appellant contends that the evidence was insufficient to prove that he "intentionally and knowingly abducted his step-daughter" and that the trial court reversibly erred by refusing to include jury instructions on the defenses of mistake of law and mistake of fact. *See id.* §§ 8.02, .03. For the following reasons, we affirm the judgment of conviction.

## Background

Appellant is married to Bobbi Battishia White; White previously was married to Michael Rogers; and White and Rogers are the parents of Z.R.,[1] who was seven years old on November 12, 2016, the day that White, appellant, and appellant's cousin Derrick Lamont Bailey, Jr. kidnapped her. At that time, White and Rogers were involved in civil ligation over the custody of Z.R., and White was subject to court orders that gave Rogers sole temporary possession of Z.R. and prohibited White from possession of or access to the child, disturbing the peace of the child, and from "hiding or secreting the child from [Rogers]."

The jury heard evidence that Rogers and Z.R. were walking to their vehicle in a movie theater parking lot when appellant approached Rogers in an "aggressive manner, as if he was trying to engage [Rogers] in a physical fight" and then "had Mr. Rogers down on the ground, repeatedly punching him" while White "grabbed" Z.R. and "put her in the car" that Bailey was driving. After White and Z.R. got into the car, which also had another child as a passenger, appellant "released" Rogers, ran to the car, and got in. Rogers pursued him and "landed one punch through the passenger door window, but he backed up and the car sped off." Rogers "froze" and "backed up a little bit" when Bailey pointed a gun at him. As the car was driving away, Rogers ran to his vehicle to follow the car, but he was unable to do so because his vehicle had a flat tire since "[t]he air valve was ripped off."

After driving away from the parking lot, appellant, White, Bailey, Z.R., and the other child changed vehicles and then drove to Georgia, where White recently had rented an apartment, and Alabama. After Bailey and the child were no longer in the vehicle, appellant and White left Z.R. at an abandoned house in Alabama where she was discovered by two people who

---

[1] To protect her privacy, we refer to the child by her initials.

lived across the street from the house. One of those people testified at trial that they heard a child crying and saw Z.R. across the street and that Z.R. told them that her mother had left her at the house by herself and that she did not know where her mother was. Around that time, they also received an AMBER alert about Z.R. and called the police. The police took custody of Z.R. and arranged for Rogers to come get her in Alabama.

Based on the November 12, 2016, incident, the State indicted appellant for the offense of aggravated kidnapping, alleging that:

> [Appellant], on or about the 12th day of November 2016, . . . did then and there individually and as a party with Bobbi Battishia White and Derrick Lamont Bailey, Jr., intentionally and knowingly abduct [Z.R.] by restricting the movements of said [Z.R.] without her consent so as to interfere substantially with her liberty, by moving her from one place to another or confining her, with the intent to prevent her liberation, by secreting or holding her in a place where she was not likely to be found, and the defendant did then and there use or exhibit a deadly weapon, to wit: a firearm, during the commission of the offense.

*See* Tex. Penal Code §§ 20.03, .04; *see also id.* §§ 7.01 (addressing parties to offense), .02 (addressing criminal responsibility for conduct of another).

The jury trial occurred in October 2018. Appellant represented himself with standby counsel. The State's witnesses included Rogers; Z.R.; an eyewitness to the November 2016 incident; responding and investigating officers to the incident; FBI agents and other officers who assisted with locating Z.R.; one of the people who found Z.R. at the abandoned house in Alabama; and officers who were involved in prior incidents involving appellant, Rogers, White, and Z.R.[2] The testimony of the eyewitness, Rogers, and Z.R. was consistent that

---

[2] A detective with the Killeen Police Department testified about his investigation of a domestic violence incident between White and appellant in April 2016. The detective testified that White said that appellant "squeeze[d] her neck" but that she did not want to press charges. The exhibits included recordings of the 911 calls between the operator and White during the

3

appellant was the aggressor in the physical altercation with Rogers while White was putting Z.R. into the car. Z.R.'s testimony included that appellant "hurt" Rogers, White told her to "hurry to the car," and she was scared and did not want to get into the car. In addition to describing the incident, Rogers testified that Bailey "actually came to [his] house the day [before the incident] posing as somebody who cuts grass, asking [him] to cut [his] grass"; that White and appellant were not allowed to have access to Z.R. at the time of the incident; that Rogers was the only one with legal access to her; that Z.R. was not allowed to be taken outside of Bell County; and that White and appellant previously had taken or attempted to take Z.R. from Rogers.[3]

The exhibits at trial included photographs showing Rogers's injuries from the incident and the deflated tire on his vehicle; copies of pleadings in the custody dispute and court orders that granted possession of the child to Rogers, including temporary restraining orders

_____

incident. On the recordings, White can be heard talking to Z.R. and appellant, screaming, and saying multiple times to appellant to "leave [her] alone." She also tells the operator that appellant was "breaking down doors"; that he "pushed" and "started choking" her; that he was in the house "wandering around with a[n] AK47"; and that a child was in the house.

A patrol officer from the Killeen Police Department provided testimony about an incident in July 2016. He testified that he was called to the hospital for injury to a child, and he spoke with Rogers and Z.R. Pursuant to a writ of attachment, the police had taken Z.R. from White earlier in the day and delivered her to Rogers. Rogers told the officer that, when he removed her clothes to give her a bath, "he realized she had some pretty extensive bruising on her extremities and immediately brought her to the hospital," and that Z.R. told Rogers "White had inflicted the injury on her because she wasn't a good listener." Z.R. told the officer that White "spanked [her] again because she wasn't a good listener" and that "she was actually struck in the face with a belt." As a result of Z.R.'s injuries, a forensic examination was performed on Z.R. The exhibits at trial included photos of the bruises on Z.R.'s body at that time.

[3] Rogers testified about an incident in August 2016 where White and appellant "grabbed" Z.R. at the mall and kept her for "about a week" and an incident at Z.R.'s school in October 2016 where White attempted to take Z.R. from Rogers but was prevented from doing so. As a result of this incident, White was arrested for assaulting Rogers, and the trial judge in the custody dispute ordered that White would no longer have any visitation with Z.R. Prior to the incident at the school, White had been allowed supervised visits.

4

(TROs) against White;[4] and the gun that was used during the commission of the offense. A special deputy with the United States Marshals Service found the gun in Bailey's waistband when he arrested Bailey in Alabama at his place of work in January 2017. The State's exhibits also included recordings of a call between an FBI agent and appellant and a subsequent call between the agent and White after the AMBER alert had issued. Both appellant and White represented to the agent that they were in Killeen when they were in Alabama.

Appellant testified on his own behalf concerning the incident. Appellant did not dispute that he was in a physical altercation with Rogers in the movie theater's parking lot; that he, White, Bailey, and another child drove away from the parking lot with Z.R.;[5] and that he and White took Z.R. to Alabama and left her at the house where she was found. Appellant testified that he, White, Bailey, and the other child drove from Georgia or Alabama to Killeen, arriving on November 12, 2016, and that they planned to go to the movies. He testified that: (i) he "was sitting in the car while [White] was going to make sure they still had tickets available," "heard mommy," saw Z.R. "running towards her mother," and Rogers "approaching [White]"; (ii) he "got out of the car to ask [Rogers] what he was doing," Rogers "began to swing at [him]," and they started fighting; (iii) because he did not want Z.R. to see them fighting, appellant "backed

---

[4] The exhibits included Rogers's petition to modify the parent-child relationship that was filed in July 2016; a TRO against White that was signed in July 2016; the writ of attachment that was signed in July 2016 to deliver the child to Rogers; a TRO against White signed in October 2016; an order on motion to extend the TRO that was signed in October 2016 because White's attorney had a "schedule conflict"; and a second order on motion to extend the TRO because White's attorney had a "schedule conflict." The trial court signed the second order on November 8, 2016, which set the temporary injunction hearing for November 16, 2016. The extended TRO was binding on White and her agents and "those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise."

[5] He testified that he told his cousin Bailey to "drive off" because Rogers "was at the car acting irate."

up and ran to the car"; and (iv) they "started on a trip back to Alabama" to take the other child who was in the car to his mother.[6]  He denied that there was a gun in the car and contended that the TRO was expired, that he had "no awareness" of a court order that prohibited him and White from having possession of Z.R., and that they had not kidnapped Z.R. because White was Z.R.'s mother.  As to the AMBER alert, he testified that he contacted the police to have them cancel the alert, but he represented to the FBI agent at that time that he was in Killeen when he was in Alabama.

The jury found appellant guilty.  Following the punishment phase of the trial, the jury assessed punishment at confinement for life.  The trial court entered judgment in accordance with the jury's verdict.  This appeal followed.[7]

## Analysis

### Sufficiency of Evidence

In his first issue, appellant contends that the evidence was insufficient to prove that he "intentionally and knowingly abducted his step-daughter" because "when he helped his wife take possession and control of the child[, he] mistakenly believed his wife had the right to take possession and control of the child."

### Standard of Review

Under the legal sufficiency standard of review, we consider the evidence in the light most favorable to the verdict and determine whether "any rational trier of fact could have

---

[6]  Appellant testified that the other child was two years old, "it was his first time being outside the state of Alabama," and the child "want[ed] his mother."

[7]  Appellant is represented by court-appointed counsel on appeal.

found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018).  Under this standard, we defer to the jury's resolution of conflicts in testimony, weighing of the evidence, and drawing of reasonable inferences from basic facts to ultimate facts.  *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *see Nisbett*, 552 S.W.3d at 262 (explaining that standard of sufficiency review "gives full play to the responsibility of the factfinder" and that "court's role on appeal is restricted to guarding against rare occurrence when the factfinder does not act rationally"); *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015) ("The trier of fact is the exclusive judge of the credibility and weight of the evidence and is permitted to draw any reasonable inference from the evidence so long as it is supported by the record."). "Furthermore, the trier of fact may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence." *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014).

**Appellant's Challenge to the Sufficiency of the Evidence**

Appellant challenges the sufficiency of the evidence to prove that he had the required culpable mental state to commit the offense of kidnapping.[8]  A person commits the offense of kidnapping "if he intentionally or knowingly abducts another person." *See* Tex. Penal

---

[8]  Appellant "concedes that the evidence before the jury allowed the jury to find that he, his wife, and his cousin acquired possession of [Z.R.] from [Z.R.]'s father in the parking lot of a movie theater on November 12, 2016, and that they subsequently took her to a home in Alabama where she was ultimately recovered by the police."  He also does not raise a sufficiency challenge concerning the aggravating element of the charged offense. *See* Tex. Penal Code § 20.04(b) ("A person commits an offense [of aggravated kidnapping] if the person intentionally or knowingly abducts another person and uses or exhibits a deadly weapon during the commission of the offense."); *Laster v. State*, 275 S.W.3d 512, 521 (Tex. Crim. App. 2009) (stating elements of aggravated kidnapping).

Code § 20.03(a). "'Abduct' means to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." *Id.* § 20.01(2); *see id.* § 20.01(1) (defining "restrain" to mean "to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person").

The offense of kidnapping is a result-oriented offense. *Llorens v. State*, 520 S.W.3d 129, 138 (Tex. App.—Austin 2017, pet. ref'd) (explaining that kidnapping is result-oriented offense and that offense "is legally completed when the defendant, at any time during the restraint, forms the intent to prevent liberation by secreting or holding another in a place unlikely to be found" (quoting *Laster v. State*, 275 S.W.3d 512, 521 (Tex. Crim. App. 2009))); *Gonzales v. State*, 270 S.W.3d 282, 288 (Tex. App.—Amarillo 2008, pet. ref'd) (explaining that "ultimate issue in kidnapping offense is the abduction of the victim, i.e., the result" (citing *Phillips v. State*, 597 S.W.2d 929, 936 (Tex. Crim. App. 1980))). "A person acts intentionally, or with intent, with respect to … a result of his conduct when it is his conscious objective or desire … to cause the result." Tex. Penal Code § 6.03(a). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b).

Appellant argues that "the jury could not rationally have disagreed with [his] conclusion that the prior temporary court order limiting the wife's access to the child had expired, and that therefore neither he nor his wife could be held legally liable for abduction." He further argues, "[g]iven that [he] was unaware that the temporary order had been extended and that he was acting under the assumption that White was entitled to possession of the child, the jury could not rationally infer that he intentionally or knowingly abducted [Z.R.] as he was

charged." Appellant argues that there was no evidence adduced at trial to show that he or White "were ever served with the ex parte-acquired temporary orders delineating the rights of the parties subsequent to White's and Rogers' divorce."

The exhibits at trial, however, included the TROs, the order in October 2016 extending the TRO, and the second order on November 8, 2016, extending the TRO. The second order reflects that the TRO was extended because of a "schedule conflict" that White's attorney had. This evidence supports a reasonable inference that White through her attorney was aware that the TRO remained in effect on November 12, 2016. There also was other evidence that White and appellant were aware that they were prohibited from taking Z.R. from Rogers at the time of the incident. For example, in the recorded call between White and the FBI agent after the AMBER alert, White states that she was served with modification paperwork, the writ of attachment, and "two restraining orders" but contends that the restraining orders and writ of attachment "were done illegally." She also states that "every time [she goes] to court [she] keep[s] getting restrained to not do anything" and "why do they keep saying that she can't see her child." We cannot agree with appellant's contention that there was no evidence that he and White were aware at the time of the incident that they were prohibited from taking possession of Z.R. from Rogers.

Further, even if appellant's contentions were true, they do not negate the State's evidence of his culpable mental state but apply to portions of an affirmative defense to the offense of kidnapping. "It is an affirmative defense to prosecution [of the offense of kidnapping] that: (1) the abduction was not coupled with intent to use or to threaten to use deadly force; (2) the actor was a relative of the person abducted; and (3) the actor's sole intent was to assume lawful control of the victim." Tex. Penal Code § 20.03(b); *see id.* § 20.01(3) (defining "relative"

9

to include parent or stepparent). The State is not required to negate the existence of an affirmative defense to prove its case. *See id.* § 2.04 (addressing affirmative defenses in Texas Penal Code and explaining that "prosecuting attorney is not required to negate the existence of an affirmative defense in the accusation charging commission of the offense"). Thus, even if the evidence established that appellant mistakenly believed that he was acting with White to assume lawful control of Z.R., such evidence would have applied to the affirmative defense to the offense and would not negate the evidence of the required culpable mental state—that he intentionally or knowingly abducted her. *Id.*; *Lugo v. State*, 923 S.W.2d 598, 601 (Tex. App.— Houston [1st Dist.] 1995, pet. ref'd) (concluding that defendant's mistaken belief that he was relative of child applied to affirmative defense but did not negate required culpable mental state for offense of kidnapping).

Based on the evidence, including the actions and conduct by appellant, White, and Bailey, a rational trier of fact could have found that appellant was aware that their conduct was reasonably certain to cause Z.R.'s abduction or it was his conscious object or desire to restrain Z.R. and "prevent [her] liberation . . . by secreting or holding [her] in a place where [she] was not likely to be found." *See* Tex. Penal Code § 6.03(a), (b); *Dues v. State*, 634 S.W.2d 304, 305 (Tex. Crim. App. 1982) (explaining that intent may be inferred from defendant's acts, words, and conduct). The evidence at trial included: (i) Rogers's testimony that Bailey was at Rogers's house the day before the incident "posing as somebody who cuts grass" and that he pointed a gun at Rogers during the parking-lot incident; (ii) the eyewitness's testimony that appellant approached Rogers in the movie theater parking lot in an "aggressive manner" and had him "on the ground, repeatedly punching" him while White "grabbed" Z.R. and "put her in the car"; (iii) appellant's testimony that they drove away with Z.R., switched vehicles, drove to Georgia

10

and Alabama, and misrepresented to the police that they were in Killeen when they actually were in Alabama; (iv) Z.R.'s testimony about the incident, including that appellant "hurt" Rogers, White told her to "hurry to the car," and she was scared and did not want to get into the car; and (v) the testimony from the person who found Z.R. in Alabama at the abandoned house.

Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence was sufficient to prove that appellant intentionally or knowingly committed the offense of aggravated kidnapping as charged in the indictment. *See Jackson*, 443 U.S. at 319; *Ramsey*, 473 S.W.3d at 809; *Acosta*, 429 S.W.3d at 625. We overrule appellant's first issue.

**Jury Charge**

Appellant's second and third issues complain of jury charge error. He contends that the trial court reversibly erred when it refused to include instructions in the jury charge on the defenses of mistake of law and mistake of fact.

### Standard of Review

We review alleged jury charge error in two steps: first, we determine whether error exists; if so, we then evaluate whether sufficient harm resulted from the error to require reversal. *Arteaga v. State*, 521 S.W.3d 329, 333 (Tex. Crim. App. 2017); *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). The degree of harm required for reversal depends on whether the jury charge error was preserved in the trial court. *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016); *see Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g) (setting forth procedure for appellate review of claim of jury charge error). If the complaint about jury charge error was preserved in the trial court, as is the

11

case here, "then reversal is required if there was some harm to the defendant." *Marshall*, 479 S.W.3d at 843.

"A defendant is entitled to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or uncontradicted, and regardless of how the trial court views the credibility of the defense." *Celis v. State*, 416 S.W.3d 419, 430 (Tex. Crim. App. 2013) (citing *Allen v. State*, 253 S.W.3d 260, 267 (Tex. Crim. App. 2008)). "However, '[t]he issue of the existence of a defense is not submitted to the jury unless evidence is admitted supporting the defense.'" *Kuhn v. State*, 393 S.W.3d 519, 532 (Tex. App.—Austin 2013, pet. ref'd) (quoting Tex. Penal Code § 2.03(c)). "Therefore, if the evidence, when viewed in the light most favorable to the defendant, does not establish the defense, the defendant is not entitled to an instruction on the issue." *Id*. (citing *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001)). "[T]he evidence must be such that it will support a rational jury finding as to each element of the defense." *Id.* (quoting *Shaw v. State*, 243 S.W.3d 647, 658 (Tex. Crim. App. 2007)). "In determining whether a defense is supported by the evidence, 'a court must rely on its own judgment, formed in the light of its own common sense and experience, as to the limits of rational inference from the facts proven.'" *Id.*

Guided by these standards, we turn to appellant's complaints about the jury charge.

### Defenses of Mistake of Fact and Mistake of Law

Appellant argues that the trial court reversibly erred by refusing to include instructions on the defenses of mistake of law and mistake of fact in the jury charge. "It is an affirmative defense to prosecution that the actor reasonably believed the conduct charged did not

constitute a crime and that he acted in reasonable reliance upon … an official statement of the law contained in a written order," grant of permission from an administrative agency, or a written interpretation of the law in a court opinion or made by a public official. Tex. Penal Code § 8.03(b). Also, "[i]t is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense." *Id.* § 8.02(a).

Making similar arguments to the ones that he raised in his first issue challenging the sufficiency of the evidence, appellant argues that his mistake of law or fact was his reasonable belief that the court orders prohibiting White from possession of or access to Z.R. were expired. He argues that there was no evidence that the temporary restraining orders or their extensions were served on White or appellant or that they had actual knowledge of the orders. Appellant explains the "crux" of his argument as follows: "Viewing the testimony in the light most favorable to [appellant], the evidence, *i.e.*, both [appellant]'s testimony and that of other witnesses, when taken together with a reasonable inference derived from the lack of any documentation to the contrary, raised fact issues concerning whether [appellant] formed a reasonable belief that his conduct and that of his wife was no longer governed by an expired temporary possession order, and whether, in turn, that mistaken belief of law or of fact affected his culpable mental state."

As we explained in our analysis of his sufficiency challenge to the evidence, however, even if the evidence raised a fact issue in this case about appellant's awareness of the court orders against White, this evidence goes to the affirmative defense to kidnapping, *see id.* § 20.03(b), and not to the culpable mental state for the underlying offense, *see Lugo*, 923 S.W.2d at 601 (explaining that defendant's belief that he was parent or relative of child "applies to a

13

portion of the affirmative defense to kidnapping, not to the elements of the underlying offense"). Thus, the evidence does not raise the mistake of fact defense. *See Lugo*, 923 S.W.2d at 601 ("A mistake about the existence of a fact which would establish an affirmative defense to an offense, rather than negating the element of the offense, does not raise the mistake of fact defense."); *see also Hoopes v. State*, No. 03-16-00258-CR, 2018 Tex. App. LEXIS 2992, at *9 (Tex. App.—Austin Apr. 27, 2018, pet. ref'd) (mem. op., not designated for publication) (concluding that trial court did not err in denying instruction on defense of mistake of fact because "the [asserted] defense 'did not negate the kind of culpability required for the offense [of violating a protective order]"); *Green v. State*, No. 14-16-00740-CR, 2018 Tex. App. LEXIS 103, at *9 (Tex. App.—Houston [14th Dist.] Jan. 4, 2018, pet. ref'd) (mem. op., not designated for publication) (concluding that trial court did not abuse its discretion in denying appellant's request to instruct jury on mistake of fact because appellant's "mistaken belief that the complainant was involved in the burglary does not negate his culpable mental state—rather it raised the justification defenses of protection of property and use of deadly force to protect property").

We similarly conclude that the evidence did not raise the defense of mistake of law. *See* Tex. Penal Code § 8.03(b); *Celis*, 416 S.W.3d at 430; *Kuhn*, 393 S.W.3d at 532. "[T]o be entitled to the statutory defense of mistake of law, a defendant must present some evidence that (1) he reasonably believed that his conduct did not constitute a crime; and (2) he reasonably relied upon either an official statement of the law or a written interpretation of the law of the type specified in the statute." *Hoopes*, 2018 Tex. App. LEXIS 2992, at *10–11 (citation omitted)). Even if the court orders prohibiting White from possession of or access to Z.R. had expired, appellant has not identified an authority of the type specified in the statute—such as an official statement of the law or a written interpretation of the law in a court opinion—that he reasonably

could have relied upon to believe his conduct during the commission of the offense did not constitute a crime. *See Hawkins v. State*, 656 S.W.2d 70, 73 (Tex. Crim. App. 1983) (noting that statutory defense of mistake of law "requires reliance on a narrow class or official statements or interpretations of the law"); *see also* Tex. Penal Code § 20.03(b)(1) (including among elements of defense to kidnapping that "abduction was not coupled with intent to use or threaten to use deadly force").

Because we have concluded that the evidence did not raise the defenses of mistake of law or mistake of fact, we conclude that the trial court did not err when it did not instruct the jury on those defenses. *See Celis*, 416 S.W.3d at 430; *Kuhn*, 393 S.W.3d at 532. We overrule appellant's second and third issues.

## Conclusion

Having overruled appellant's issues, we affirm the trial court's judgment of conviction.

_____
Melissa Goodwin, Justice

Before Justices Goodwin, Triana, and Kelly

Affirmed

Filed: March 19, 2020

Do Not Publish

15