**Affirm and Opinion Filed August 24, 2021**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-20-00303-CR

**NICOLE DANIELLE WILLIAMS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 2**
**Dallas County, Texas**
**Trial Court Cause No. F-1875628-I**

## MEMORANDUM OPINION

Before Justices Molberg, Goldstein, and Smith
Opinion by Justice Molberg

Appellant Nicole Williams was convicted of murder and sentenced to forty

years' confinement. In her sole issue in this appeal, she argues that the State failed

to prove beyond a reasonable doubt that she did not act in self-defense when she shot

the complainant. We affirm the trial court's judgment in this memorandum opinion.

*See* TEX. R. APP. P. 47.4.

BACKGROUND

Brittany Hooks and Danielle Sneed met in 2016, and their friendship

eventually developed into a committed, romantic relationship. Sneed's ex-boyfriend

and the father of her two children, Brandon Alford, did not approve of their

relationship. Alford began dating appellant at some point, and appellant met Hooks and Sneed when they periodically went to appellant and Alford's apartment to pick up Sneed and Alford's children.

Alford sometimes contacted Sneed "when it wasn't about the kids," which Hooks did not like. Sneed testified that Hooks was insecure about their relationship. Hooks wanted Sneed to let Alford know that he should not contact her "unless it was about the kids specifically." On the morning of May 6, Sneed and Hooks were discussing this, and Sneed texted Alford, telling him, "Please do not call me after 9pm or Hit me up for anything but the kids seriously. . . . If u can't do that then I will just have to let [appellant] know how u don't respect my relationship!"

Hooks took Sneed's phone without her knowing about it and sent group text messages to Alford and appellant that included a number of screen shots of past text messages Alford had sent Sneed. For example, in one of these past messages, Alford had texted Sneed, "I Love you n I want to give it another try for my kids." Hooks then texted Alford and appellant, still from Sneed's phone, several times: "Now worry bout yo bitch and not mine," "If yu can't lil bitch boy I know you location you think yu crazy but you ain't seen shit over here," and "Try me." Appellant responded, "He is worried about his bitch. Bitch that's why u mad. If u was really happy u wouldn't of sent these text. Fuck all y'all." Hooks, again from Sneed's phone, responded, "Then why he sending her messages tryna fuck????? And bitch you can get it too for not keeping yo n[****] in check." Alford chimed in, "Get her

answer the phone she kno that," and "Ask her." Appellant responded with another taunt, ending with "Pull up Bitch." Hooks texted back, "Yu can either shut the up witcha illiterate ass or do something," and "Bet omw." Appellant responded, "Bet." Sneed explained at trial that "pull up" means "come over, let's fight," and "bet, omw" means "okay, on my way."

Sneed testified that at that point, Hooks was getting her keys, getting ready to drive to appellant's apartment. Hooks told Sneed that she was going over to appellant's apartment because Hooks "wanted to fight." Hooks said that appellant "told her to pull up." Sneed tried talking Hooks out of it to no avail. Sneed went with her because she did not want Hooks going by herself. Hooks drove them in her black Saturn SUV and Sneed was in the passenger seat.

When they arrived at Alford and appellant's building, they backed into a parking spot near the leasing office, facing the building. Sneed texted appellant at Hooks's request, "Come outside." Sneed testified that shortly afterwards, she saw "[appellant] coming outside with the gun." A surveillance video admitted at trial showed appellant chambering a round of her handgun as she walked towards Hooks's car. The windows of the car were rolled down, and Sneed heard appellant yelling as she approached the car. Hooks yelled back at appellant from her seated position in the driver's seat. Appellant got to the passenger side of the car and yelled at Hooks across Sneed, and Hooks yelled back.

–3–

Hooks exited the Saturn, and she and appellant "met at the front of [the] car, and [Hooks] got ready to swing." Sneed stated that she did not remember Hooks connecting or hitting appellant, but "that's when [appellant] shot [Hooks] in the face." Sneed testified that, before appellant shot Hooks, they were both in a "fighting stance." But, she testified, there was never a struggle between Hooks and appellant, nor did Hooks have any weapon. After being shot, Hooks fell backwards and her hat flew off. Sneed panicked and jumped out of the car. Appellant walked back towards the apartment, and Sneed chased after her, screaming appellant's name, asking "why." Appellant went up the stairs to the apartment, and Sneed ran back to Hooks, who was struggling to breathe. Sneed called 9-1-1.

A resident who happened to be in the parking lot at the time, Brionna Uchi, testified about what she saw. Uchi said that she saw Hooks throw the first punch, but that appellant punched back. Uchi testified that "they were punching each other." She was not close enough to see whether any punches landed. Uchi saw appellant's gun in her hand after two or three punches had been thrown. She testified that appellant was fighting with the gun in her hand. But quickly after the fighting started, maybe five punches or a matter of seconds, it was over when she "heard the gunshot go off."

Appellant testified in her defense. She said Alford, who was out of town, had told her over the phone about his text conversation with Sneed, and appellant was consequently upset. While she was still on the phone with Alford, she received the

—4—

screenshots of messages he sent Sneed in March. She became very angry at Alford. Appellant received the subsequent, threatening messages from Sneed's phone and became confused. She testified that she texted "pull up" to "shut the conversation down"; she did not think that Sneed was really going to come over. But after she received a text from Sneed's phone saying she was on her way, appellant thought "[Sneed] and her posse" were coming.

Appellant testified that she got her clothes and gun to leave. She was walking to her car when she saw Sneed sitting in parked car that she did not recognize. She testified that Sneed was with who appeared to her to be "a guy." Appellant went to Sneed's side of the car and began yelling at her, asking her what she was doing at the apartment. Sneed did not respond, and appellant testified that she turned to walk back to her apartment. When she turned, someone was "standing in front" of her. Appellant described this person as tall, dressed in basketball shorts, with dreadlocks covering her face, so she "thought that it was a boy." As appellant turned, she said, the person came towards her, and she could not see the person's hands.

Appellant said that she backed up, and when she "felt [herself] getting closer to the fence, [she] put [her] gun up," and yelled, "Get back in the car." Appellant said that once Hooks was closer to her, she saw that it was a woman and she lowered her weapon. Appellant said Hooks started backing up, and appellant walked "with her to make sure that she was going back into her car." Appellant testified that she glanced at Sneed and then felt a hard blow and she "started seeing white stars." She

testified, "I didn't know what hit me, what happened," but she got scared and panicked. Appellant further testified, "I didn't want to get hit again, I had a gun in my hand and I just went back and then I fired." On cross-examination, appellant said that she did not know where she was shooting, she "just fired."

The police and an ambulance arrived and took Hooks to Parkland Hospital. Medical records admitted at trial indicated that Hooks died as a result of her gunshot wound, which caused "intracranial injury." The medical examiner testified and confirmed that Hooks's cause of death was a gunshot wound to the face. Officer Lawrence Christian testified that he secured a search warrant for appellant's apartment, where police found appellant's handgun on the bed.

Appellant turned herself in to police the day after the shooting. Detective Jacob White testified that, when he interviewed her, he did not observe any injuries on her person. Two of appellant's friends testified that appellant had a reputation as a truthful person.

## DISCUSSION

Appellant does not argue that the evidence was not sufficient to show that she intentionally or knowingly caused Hooks's death. Instead, appellant argues that the State failed to negate her claim of self-defense beyond a reasonable doubt. She

argues that "a reasonable jury could not have concluded, beyond a reasonable doubt, that [appellant] did *not* act in self-defense."

*Standard of review*

The State must prove each essential element of an offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). When reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. at 319. When the record supports conflicting reasonable inferences, we presume that the jury resolved the conflicts in favor of the verdict. *Id*. at 326.

The jury is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *Curry v. State*, 622 S.W.3d 302, 310 (Tex. Crim. App. 2019). The trier of fact may choose to disbelieve all or any part of a witness's testimony. *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018). "A court's role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018).

*Applicable law*

A person commits murder if she "intentionally or knowingly causes the death of an individual" or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.02(b)(2). But a person "is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id*. § 9.31(a). Deadly force in self-defense is justified when a person reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force. *Id*. § 9.32(a)(2)(A). Deadly force is "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id*. § 9.01(3).

A defendant bears the burden to produce some evidence that supports her claim of self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). "Once the defendant produces such evidence, the State then bears the burden of persuasion to disprove" self-defense beyond a reasonable doubt. *Id*. "The burden of persuasion is not one that requires the production of evidence, rather it requires only that the State prove its case beyond a reasonable doubt." *Id*.; *see also Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991) (en banc). "The jury is the sole judge of the credibility of defensive evidence, and it is free to accept it or reject

it." *Rankin v. State*, 617 S.W.3d 169, 183 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) (citing *Braughton v. State*, 569 S.W.3d 592, 609 (Tex. Crim. App. 2018)).

In sum,

> [i]n resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt.

*Saxton*, 804 S.W.2d at 914.

### *Analysis*

Appellant argues specifically that "a sucker punch by a six-foot, twenty-five-year-old woman, directly to the face of another person, certainly qualifies to meet the standard of being 'capable' of causing serious bodily injury." Since, appellant argues, she did not shoot Hooks until after Hooks struck her in the face, no reasonable juror could have concluded that appellant did not act in self-defense. We disagree.

The jury could have reasonably determined that Hooks's punch alone did not justify the use of deadly force. To begin with, the jury was not required to believe appellant's testimony that she was "sucker punched." Sneed and Uchi both testified that appellant and Hooks approached each other to fight. Sneed said both of them were in a "fighting stance." And Uchi said that they "square[d] up" like they were "about to fight or get into each other's faces." Moreover, the jury could have

–9–

reasonably concluded that Hooks's punch was not itself deadly force. Sneed testified that she did not see Hooks's punch connect. As the State points out in its brief, on the security footage admitted at trial, appellant "showed no signs of physical distress as she walked back to her apartment right after the shooting." Detective White testified that, when he interviewed appellant a couple of days after the shooting, he did not observe any facial injuries. And the jury could have credited Uchi's testimony that, not only did appellant not fall after being struck by Hooks, appellant returned Hooks's punch with her own. There was no evidence that Hooks was armed or that she did anything other than punch or attempt to punch appellant. *See, e.g.*, *Dearborn v. State*, 420 S.W.3d 366, 378 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("courts have not treated blows with fists as deadly force").

Thus, "a rational jury could have determined that the physical assault itself was not of such a nature that it would give rise to a reasonable belief regarding the necessity of deadly force." *See Braughton*, 569 S.W.3d at 611; *see also Robic v. State*, 05-16-00337-CR, 2017 WL 2665269, at *6 (Tex. App.—Dallas June 21, 2017, pet. ref'd) ("a rational jury could conclude that Keech's single punch, push, and attempt to tackle Robic was not the use or attempted use of unlawful deadly force against Robic or Megan and that Robic's belief that deadly force was immediately necessary was not reasonable under the circumstances").

Accordingly, we conclude that legally sufficient evidence supported the jury's verdict because a rational trier of fact could have found the essential elements

–10–

of murder beyond a reasonable doubt and also could have found against appellant on her self-defense issue beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914. Appellant's sole issue is overruled.

CONCLUSION

We affirm the trial court's judgment.

/Ken Molberg/
KEN MOLBERG
JUSTICE

200303f.u05
Do Not Publish
TEX. R. APP. P. 47



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

NICOLE DANIELLE WILLIAMS,
Appellant

No. 05-20-00303-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 2, Dallas County, Texas Trial Court Cause No. F-1875628-I. Opinion delivered by Justice Molberg. Justices Goldstein and Smith participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 24th day of August, 2021.