

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| JAMES CHRISTOPHER STEWART, | § | No. 08-23-00290-CR |
| Appellant, | § | Appeal from the |
| v. | § | 399th Judicial District Court |
| THE STATE OF TEXAS, | § | of Bexar County, Texas |
| Appellee. | § | (TC# 2020CR6504) |

### MEMORANDUM OPINION[1]

At trial, there was no dispute that Appellant, James Christopher Stewart, shot and killed his girlfriend, Tiffany Washington, while the couple was inside their house. In two counts, Appellant was charged with the offense of murder and the offense of aggravated assault with a deadly weapon causing serious bodily injury to a person with whom he had a dating relationship, alleged to have been committed on or about April 25, 2020. Appellant argued to the jury that he shot Ms. Washington accidently. The jury found him guilty on both counts and assessed punishment at 75 years' confinement with no fine. The trial court entered a judgment of conviction on the murder charge, with punishment at 75 years' confinement and no fine.

---

[1] The appeal was transferred to this Court from the Fourth Court of Appeals pursuant to a Texas Supreme Court docket equalization order. Accordingly, we apply the Fourth Court of Appeals' precedent to the extent it conflicts with our own. *See* Tex. R. App. P. 41.3.

In a single issue on appeal, Appellant asserts the evidence is legally insufficient to support his conviction. According to Appellant, the testimony of two Bexar County Sheriff's Department investigators (Frank Spencer Stubbs, III and Houston Pons) about what Appellant said during a video-recorded interview was irrelevant, mere speculation, and personal opinion.[2] And, he argues, absent their speculative, inconsistent, and opinion testimony, the evidence at trial was legally insufficient to prove he intentionally or knowingly caused Ms. Washington's death. We conclude the evidence is legally sufficient; therefore, we affirm.

## I. STANDARD OF REVIEW AND APPLICABLE LAW

Under the Due Process Clause of the U.S. Constitution, the State is required to prove every element of the charged offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). In assessing the legal sufficiency of the evidence to support a criminal conviction, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We defer to the trier of fact to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* "In reviewing the sufficiency of the evidence, we should look at 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Id.* (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985) (en banc)). "Each fact need not point directly and independently to the

---

[2] At trial, defense counsel raised various objections to the testimony of Investigators Stubbs and Pons, including narrative, speculative, leading, asked-and-answered, and reading from a report. Some of the objections were sustained and others were overruled. On appeal, Appellant does not assert the trial court abused its discretion regarding its evidentiary rulings or by allowing the testimony in evidence.

guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Id.*

In applying the legal sufficiency test, we defer to the fact-finder in terms of weighing inconsistencies in and assessing the credibility of witness testimony in deciding whether to believe the testimony. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). A jury is entitled to accept or reject any or all of the testimony of any witness. *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992) (en banc). We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the fact-finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).

A person commits the offense of murder "if the person . . . (1) intentionally or knowingly causes the death of an individual [or] (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1–2). "Except as provided by Subsection (d), an offense under this section is a felony of the first degree." *Id.* § 19.02(c). Subsection (d) provides that, during the punishment phase, a defendant may raise the issue of whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. *Id.* § 19.02(d). If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a second-degree felony. *Id.*

We take Appellant's contention that Ms. Washington's death was an accident as a challenge to the mens rea required for his murder conviction. In general, to establish that a defendant committed an offense, the State must establish the defendant had the mental state required for the particular offense with which he is charged. *See Ramirez-Memije v. State*, 444

3

S.W.3d 624, 627 (Tex. Crim. App. 2014); *Marquez v. State*, 697 S.W.3d 485, 498 (Tex. App.—El Paso 2024, no pet.).

As relevant here, the State was required to prove the element of intent. *See* Tex. Penal Code Ann. § 19.02(b)(1–2). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." Tex. Penal Code Ann. § 6.03(a); *see Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) (en banc) ("[m]urder is a 'result of conduct' offense, which means that the culpable mental state relates to the result of the conduct, i.e., the causing of the death"). Under Penal Code § 19.02(b)(1), the mens rea element requires that the defendant must have intentionally or knowingly caused the death of the victim. *See Smith v. State*, 554 S.W.3d 23, 25 (Tex. Crim. App. 2018). Thus, a conviction under § 19.02(b)(1) requires an intent to cause death. *See Walter v. State*, 581 S.W.3d 957, 970 (Tex. App.—Eastland 2019, pet. ref'd). Appellant's contention that Ms. Washington's death was an accident would be relevant to a conviction under § 19.02(b)(1) to the extent that it was an unintended result. *See id.* Under § 19.02(b)(2), the mens rea element requires an intent to cause serious bodily injury to an individual. *See Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012). Appellant's contention that Ms. Washington's death was an accident would be relevant to a conviction under § 19.02(b)(2) to the extent Appellant did not intend to cause serious bodily injury to Ms. Washington. *See Walter*, 581 S.W.3d at 970.

"[A] culpable mental state must generally be inferred from the circumstances." *Nisbett v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018); *Marquez*, 697 S.W.3d at 502. A jury may infer a defendant's mental state from his actions, words, or conduct. *Nisbett*, 552 S.W.3d at 267. As we have previously recognized, both "[i]ntent and knowledge are fact questions for the jury

4

and are almost always proven through the circumstances surrounding the crime." *Collins v. State*, No. 08-15-00103-CR, 2017 WL 192913, at *5 (Tex. App.—El Paso Jan. 18, 2017, pet. ref'd) (not designated for publication) (citing *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (en banc)); *see also Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (recognizing that "in homicide prosecutions, the defendant's state of mind is a question of fact that must be determined by the jury").

A specific intent to kill may be inferred from the use of a deadly weapon. *Sifuentes v. State*, 615 S.W.3d 914, 917 (Tex. Crim. App. 2021); *Cavazos*, 382 S.W.3d at 384; *see also Cardenas v. State*, No. 08-18-00083-CR, 2021 WL 3629990, at *4 (Tex. App.—El Paso Aug. 17, 2021, no pet.) (not designated for publication) (specific intent to kill may be inferred from a defendant's use of a deadly weapon unless in the manner of its use it is reasonably apparent that death or serious bodily injury could not result). A firearm, such as the shotgun here, is a deadly weapon per se. *See* Tex. Penal Code Ann. § 1.07(a)(17)(A); *Fernandez v. State*, 621 S.W.3d 818, 828 (Tex. App.—El Paso 2021, pet. ref'd); *see also Hunter v. State*, No. 01-00-00722-CR, 2001 WL 754458, at *2 (Tex. App.—Houston [1st Dist.] July 5, 2001, no pet.) (not designated for publication) ("Both rifles and shotguns are 'firearms' and deadly weapons.").

## II. BACKGROUND

Although Appellant's complaint focuses on the testimony of Investigators Stubbs and Pons, we consider all of the evidence relevant to Appellant's conviction.

### A. The shooting of Ms. Washington

On the evening of April 25, 2020, deputy sheriffs and crime scene investigators from Bexar County were called to the scene of a shooting at a house. Bexar County Deputy Sheriff Ray Colunga and his partner, Deputy Luis Dominguez, were the first officers to arrive. Deputy Colunga

said Appellant met them at the door of the house and said to them, "Please, please, please, she's still breathing, please help her." He described Appellant as "frantic" and cooperative. Several officers and paramedics attempted to aid Ms. Washington while she laid on her bedroom floor. Although shot in the abdomen, she was still breathing when the first deputies arrived and rendered aid. Deputy Sheriff Leigh Coleman-Ducote testified that she was the third officer to arrive and render aid. When she first encountered Ms. Washington on the floor of the bedroom, she saw bloodied towels on Ms. Washington's stomach, suggesting someone had been trying to apply pressure to the wound. Ms. Washington was pronounced dead at the hospital.

When Appellant met the deputies at his front door, Deputy Colunga handcuffed him and placed him in his patrol car. Deputy Colunga later transported Appellant to the Bexar County Deputy Sheriff's Department Criminal Investigation Unit (the CID). While at the CID, Appellant was interviewed by Investigators Stubbs and Pons. The jury watched the video-recording of the interview.

Deputy Tiffany Castillo testified that she examined and extracted data from two cell phones in this case. She said Appellant gave his consent to search his phone and provided his password. The other phone belonged to Ms. Washington. Deputy Castillo testified about several text messages to and from Ms. Washington's phone between 4:45 p.m. and 7:05 p.m. on April 25, 2020. One of the text messages sent by Ms. Washington to a friend at 5:06 p.m. said, "I'm thinking about moving out, but I don't want to go back to my mom's." A text from Ms. Washington at 7:18 p.m. said, "I'm leaving tomorrow." A text from Ms. Washington at 7:32 p.m. said, "So I'm packing my stuff now."

Deputy Castillo also testified about three videos extracted from Appellant's phone. The videos were taken by Ms. Washington when she had Appellant's phone,[3] and were taken in the kitchen at 8:42 p.m., the living room at 8:46:46 p.m., and the bedroom at 8:46:56 p.m. The video taken in the living room showed Appellant sitting on the couch, Ms. Washington saying something unintelligible to him, and Appellant rising from the couch to walk toward her while carrying a shotgun in his left hand. The video taken in the bedroom at 8:46:56 p.m. showed the couple arguing, Ms. Washington holding a knife and asking for her phone, Ms. Washington saying, "he hits women" and "he has a gun," and Appellant with the shotgun held down along his left side. The phone is then dropped and nothing else is seen or heard on the video. Investigator Pons stated his report showed the 911 call came in at 8:50 p.m.

Chief Bexar County Medical Examiner Kimberly Molina testified that an autopsy of Ms. Washington revealed blunt force injuries to the back of her forearms and hands and a gunshot just above and to the left of her belly button. Dr. Molina explained that shotguns shoot multiple pellets at a time, which are contained in "a shot cup or wadding," i.e., "a plastic kind of shell . . . that contains those pellets so that they stay together as they exit the firearm." According to Dr. Molina, depending on how close the firearm is to the victim when it is discharged, "that wadding, that plastic cup can actually go into the wound along with the pellets, as it did in this case." Another indication of how close the shotgun was to Ms. Washington's body when the shotgun discharged was that all the pellets entered her body as one mass; there was one large entrance wound where "everything went in together, so the pellets needed to be still in a tight cluster when they went into the body versus having already spread apart and hit the body separately." Dr. Molina thought the shotgun was three to four feet away from Ms. Washington when it was discharged. She was unable

---

[3] Later testimony revealed Appellant had taken Ms. Washington's phone and she then took Appellant's phone.

7

to state the age of the abrasions on Ms. Washington's arms, but she said there was no evidence of healing, which could mean they were from earlier in the day, the day before, or from just prior to death, "they just haven't had time to heal yet." Dr. Molina did not find any blunt force injuries, bruises, or scratches to Ms. Washington's neck. Photographs of Appellant showed an abrasion on his knee and scratches on his neck and arm.

Crystina Vachon, a forensic scientist in the trace evidence section of the CID, testified that her analysis of gunshot residue indicated both Appellant and Ms. Washington may have discharged a firearm, handled a discharged firearm, or were close to a discharging firearm. David Pendleton, a CID firearms examiner, testified that his testing of the shotgun also showed a range of three to four feet, but he believed the range was less than three feet. He said the shotgun in this case was designed to be fired with two hands, regardless of whether one is left-handed or right-handed, with one hand holding the pistol grip and a finger in the trigger guard and the other hand on the pump enabling one to slide the action back and forth. He said the shotgun did not have a hair trigger. In other words, it was not "something that I'm just going to touch it and it's going to fire"; it would "take a willful act to pull the trigger."

### B. The testimony of Investigator Frank Spencer Stubbs, III[4]

During his testimony, Investigator Stubbs testified about what Appellant told him and Investigator Pons during the video-recorded interview. Investigator Stubbs said he, Investigator Pons, and Appellant discussed Appellant and Ms. Washington's almost 20-year age difference, their financial difficulties, and their almost day-long argument the day of the shooting. Investigator Stubbs said Appellant told them he went for a drive that evening, and when he returned, he took

---

[4] Investigator Stubbs was retired at the time of trial but assigned to the Bexar County Sheriff's Office Homicide Unit in April 2020.

Ms. Washington's cell phone because he was afraid she was calling people to come get her. He locked her phone in his car, and Ms. Washington then took his cell phone.

The investigator described Appellant's demeanor during the interview as very calm, maybe a little nervous, and not agitated or upset. However, he said Appellant's story had many inconsistencies and he contradicted himself on multiple occasions. For example, Appellant said Ms. Washington grabbed a knife, but he was inconsistent about whether she grabbed the knife before or after he had taken her phone. Another contradiction regarded Ms. Washington's location in the house when Appellant got the shotgun. Investigator Stubbs said Appellant told them he retrieved the shotgun from the bedroom after Ms. Washington got the knife and threatened to slash his tires. But, according to the investigator, Appellant "kept changing his story in regards to when the knife was introduced and when the gun was introduced."

Appellant also told them he "was trying to use the shotgun as kind of a show of force." Investigator Stubbs explained that "[o]ftentimes people will rack a shotgun and charge it," and that noise is "very unsettling," and Appellant "said that he did that to show some force." But when asked about racking the shotgun, Appellant said he racked it as soon as he picked it up in the bedroom while Ms. Washington was in the garage. Investigator Stubbs said he did not "know how that could have been a show of force." After racking the shotgun, Appellant told the investigators he confronted Ms. Washington to get his phone back, and he tried to swat his phone out of her hand. Investigator Stubbs said Appellant told them he was pointing the shotgun at Ms. Washington while trying to swat the phone away, at which time he "gripped or pulled the trigger on the gun accidentally."

On cross-examination, defense counsel confronted Investigator Stubbs about whether his testimony regarding what Appellant said during the interview was "pointless" because the jury

9

could simply watch the video of the interview. Investigator Stubbs explained that the video was "poor quality." Defense counsel also asked the investigator about his testimony that Appellant said he took Ms. Washington's phone because he did not want her communicating with anyone despite that statement not being heard on the video. Investigator Stubbs replied that "the video is very poor quality, it's very hard to hear, and this is what [he] recall[ed] from three years ago." He admitted Appellant did not tell the investigators that the age difference was the reason the couple was having problems, and instead, it was Investigator Stubbs's opinion that the age gap contributed "in a small way" to why Appellant killed her. The investigator also opined that Ms. Washington's holding a knife in Appellant's face could have contributed to the shotgun going off accidently. He expanded on his testimony about what Appellant said during the interview:

Q. So he said that when he got back from the car ride with the child, she had gone and grabbed the knife and threatened to slash his tires, correct?

A. That's correct.

Q. That is when he went to go get the gun, get the shotgun from under the bed, correct?

A. That's correct.

Q. And then he went and sat on the couch and watched TV --

A. I believe --

Q. -- and she got in his face with a knife, correct?

A. I believe that was what he told us, yes.

Q. And he told you that she grabbed his phone and threw the remote control and hit him in the face with it, right?

A. I don't recall that, but I'm sure the video will bear that out.

Investigator Stubbs said that when he and Investigator Pons told Appellant that Ms. Washington had died, Appellant started to cry and said he "never intended to kill her." Investigator Stubbs agreed that Appellant's applying pressure to Ms. Washington's wound was consistent with not intending to kill her. On redirect examination, the investigator acknowledged

Appellant was inconsistent when he said the shotgun fired when Ms. Washington raised the knife but also said the shotgun fired when he tried to swat his phone out of her hand. However, the investigator agreed that Ms. Washington holding the knife and him swatting at the phone could have all happened simultaneously:

> Was he accidentally pulling the trigger because he was swiping at the phone or was he intentionally pulling the trigger because she was pulling up the knife. I mean, it's, like I say, here again, [sic] kind of contradicts himself and that's why I'm hesitant to say it was -- I suppose it could be simultaneous, but it doesn't exactly make sense.

Investigator Stubbs said Appellant told them he was not afraid of Ms. Washington and, as he walked toward her, she "back-peddled" or "retreated" into either the corner or the closet of the bedroom. He testified that although Appellant was frantic on the 911 call, "the truth is I have heard many, many 911 calls of people who just committed a heinous act and they're able to call 911 and act very frantic."

### C. The testimony of Investigator Houston Pons

Investigator Pons also testified about what Appellant told him and Investigator Stubbs during the video-recorded interview. Investigator Pons said he and Investigator Stubbs allowed Appellant to talk about what happened in his own words, and he "was kind of going into how it might have been an accident, might have been [a] self-defense type of thing." Investigator Pons also said Appellant was inconsistent at times. For example, Appellant was inconsistent about the argument; who took whose phone and what time they took each other's phones; when he got his shotgun; and when and why Ms. Washington got the knife. Investigator Pons testified that Appellant said he felt threatened twice—first while in the garage when Ms. Washington had the knife and threatened to slash his tires, and second while in the bedroom.

11

Investigator Pons said Appellant told them Ms. Washington was back-pedaling away from him into the bedroom. Regarding the shotgun, the investigator said Appellant told them he racked it and put a round in the chamber when Ms. Washington "came at him," but he also said he "charged the weapon prior to as a show of force" and he "ended up . . . sitting on the couch for a while with it."[5] Appellant told the investigators that he took Ms. Washington's phone because she "wanted to leave, she was threatening to leave him, leave the house" and wanted to call friends for help or to get a ride. However, on cross-examination, Investigator Pons agreed the video of the interview also showed Appellant telling the investigators that he asked Ms. Washington if he could take her somewhere if she wanted to leave and each time she said, "No, I'm going to stay."

Investigator Pons said Appellant understood the meaning of trigger awareness (keeping one's finger off a weapon's trigger) and muzzle awareness (keeping the weapon's muzzle pointing downward). When discussing the video in the living room with Appellant, Investigator Pons stated that Appellant said Ms. Washington had the knife and grabbed the TV remote and the phone. When discussing the video in the bedroom with Appellant, the investigator said he thought Appellant said he fired the shotgun at the end of the video, when "you clearly hear the phone drop and no fir[ing of the shotgun], but then [the phone] turns off[.]" The sound of a weapon discharging cannot be heard, but the investigator said he knew the video "was close to the time of her getting shot . . . because the time stamp [on the video] was pretty close with the 911 call."

Investigator Pons testified that Appellant was right-handed, and he agreed that Appellant would have had to transition the shotgun from his left side to his right hand to fire it. However, he explained that the video in the bedroom contradicted Appellant's statement that the shotgun accidently discharged when he tried to swat the phone out of Ms. Washington's hand because the

---

[5] Pons explained that "charging" the shotgun meant pumping the shotgun to put a round in the chamber.

video showed the shotgun at Appellant's left side and him using his left hand to hold the barrel with the muzzle pointing down. On cross-examination, when asked about the towels Appellant used to try to stop the bleeding, Investigator Pons said, "It looks like he immediately regretted what he did."

### D. Appellant's video-recorded interview

Appellant and the investigators all wore masks during the interview, making it difficult at times to hear either a question or an answer. Appellant discussed the circumstances surrounding the escalation of the argument between Appellant and Ms. Washington that eventually led to her death. Appellant said Ms. Washington told him "no, I'm not going to leave," and when he tried to leave, she blocked him and got the knife. When asked if he felt the need to have his shotgun because Ms. Washington had the knife, Appellant replied "yes." Appellant told the investigators that he asked Ms. Washington to give him his phone back and put down the knife, and he went to grab the shotgun "as a show of force to get her to keep her distance from" him. He also said that, because the baby was crying, he asked Ms. Washington to take care of the child, put the knife down, and give him his phone.

Appellant stated that he kept the shotgun under the bed without a round in the chamber. The shotgun was a pump action. Appellant said he was formerly a First Lieutenant in the Army and he understood muzzle awareness. Appellant stated he racked the shotgun to put a round in the chamber when he got the it from under the bed. The safety was off. He claimed Ms. Washington threatened to stab him even after he got the shotgun. He also said he pointed it at Ms. Washington and told her to leave him alone when she threatened to slash his tires and started calling him names. When discussing what happened in the bedroom, Appellant appeared to nod "yes" when asked if

13

the shotgun discharged when he reached with his left hand to knock his phone away from Ms. Washington.

### III. ANALYSIS

On appeal, Appellant argues that if the jury members had been allowed to decide for themselves whether there were inconsistencies that discredited his statements during the interview "without the influence of the State imposing its version of what was said in the interview," no rational juror could have found that he intentionally and knowingly caused Ms. Washington's death. But the jurors were free to decide for themselves what weight to give the testimony of the investigators or statements they heard Appellant make in the video-recorded interview. *See Brooks*, 323 S.W.3d at 899. The jury was able to assess the credibility, not only of Appellant as they watched the videotaped interview, but also of Investigators Stubbs and Pons as they listened to the investigators' testimony. *Id*. The jury also was free to reject Appellant's contention that the weapon discharged accidently. *See Adelman*, 828 S.W.2d at 421.

As stated above, the jury could infer Appellant's mental state from his actions, words, or conduct. *Nisbett*, 552 S.W.3d at 267. "[O]ne's acts are generally reliable circumstantial evidence of one's intent." *Laster v. State*, 275 S.W.3d 512, 524 (Tex. Crim. App. 2009). A specific intent to kill may be inferred from the use of a deadly weapon. *See Sifuentes*, 615 S.W.3d at 917; *Cavazos*, 382 S.W.3d at 384; *Cardenas*, 2021 WL 3629990, at *4. Contradictory evidence was before the jury. And circumstantial evidence, when viewed in a light most favorable to the verdict, as we must, supports an inference of Appellant's intent.

Appellant and Ms. Washington had been fighting all day. Appellant went and retrieved his shotgun from under the bed. While he stored it without a round in the chamber, he charged it at some point during the argument. Appellant had training as a leader in the military—he knew to

14

keep his finger off the trigger and knew to keep muzzle pointed downward. Yet, Appellant said he pointed the shotgun at Ms. Washington and told her to leave him alone when she threatened to slash his tires and started calling him names. Appellant was aware that the safety was off, as he stored it under the bed that way. And not having a hair trigger, Appellant had to employ a degree of force to pull it. *See Salvato v. State*, No. 03-17-00508-CR, 2019 WL 1051595, at *5 (Tex. App.—Austin Mar. 6, 2019, no pet.) (mem. op., not designated for publication) (concluding evidence was sufficient to uphold manslaughter conviction because jury was free to disbelieve defendant's "self-serving statements indicating that he did not believe the rifle would fire a round when he pulled the trigger or that he was not aiming at or toward his daughter when he pulled the trigger[,]" particularly in light of defendant's training regarding firearms and his experience with them).

We defer to the jury's ability to weigh inconsistencies in and assess the credibility of witness testimony in deciding whether to believe the testimony, and we do not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the jury. *See Brooks*, 323 S.W.3d at 899; *Dewberry*, 4 S.W.3d at 740. Although "it might have been the case that none of [the above] circumstances on their own would have provided a sufficient inferential link to prove that [Appellant] caused [Ms. Washington's death] intentionally or knowingly, we cannot say that the jury's resolution of this issue was irrational based on the entirety of the circumstances." *Ramirez v. State*, No. 08-17-00122-CR, 2019 WL 2482669, at *14 (Tex. App.—El Paso June 14, 2019, pet. ref'd) (not designated for publication). We therefore hold that the cumulative force of all the incriminating circumstances was sufficient to prove Appellant's intent. *Id.*

15

## IV. CONCLUSION

Considering all of the evidence in the light most favorable to the verdict, and deferring to the jury's resolution of conflicts in testimony, we conclude that a rational fact-finder could have found the essential elements of murder beyond a reasonable doubt. Therefore, we overrule Appellant's sole issue on appeal and affirm the trial court's judgment.

LISA J. SOTO, Justice

November 22, 2024

Before Alley, C.J., Palafox and Soto, JJ.

(Do Not Publish)

16